[No. S026700. Aug. 11, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW LAMONT BROWN, Defendant and Appellant.

522

## COUNSEL

Ronald S. Smith, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez, William M. Wood, Leslie B. Fleming and David Delgado-Rucci, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—Andrew Lamont Brown was convicted in 1992 in Riverside County Superior Court of the robbery and first degree murder of Christina Ann Barraza Ramirez. (Pen. Code, §§ 187, 211; all further statutory references are to this code unless otherwise indicated.) The jury also sustained a special circumstance allegation that defendant committed the murder while engaged in the commission of a robbery (§ 190.2, former subd. (a)(17)(i), now redesignated subd. (a)(17)(A)) and two enhancement allegations that he personally used a firearm in the commission of his crimes (§ 12022.5, subd. (a)). On March 5, 1992, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

After considering the claims raised on appeal, we affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase*

Levi Gardner bought a Mitsubishi Mighty Max pickup truck on November 1, 1988. Defendant asked him if he would like to buy some deep-dish tire rims for his truck. Gardner replied that he would have to see them before committing to buying some. Defendant said he could obtain some. P. M. (a 15-year-old minor) overheard the conversation and confirmed it.

In November 1988, defendant was living "off and on" in a home near Perris, California, with Mark Bender, Broderick Fields, P. M., Andrew White and others. Defendant told White he "was going to do a jack move to get some rims" (by which he meant he was going to "rob somebody at gunpoint for their car") and asked White to join him. White declined. On November 11, 1988, defendant, Fields, Mark Bender and P. M. left in Bender's Oldsmobile Cutlass and drove around, looking for some deep-dish rims to steal.

Joe Ramirez was married to victim Christina Ramirez. In November 1988, he owned a red 1985 Nissan minitruck with a red camper shell. It had been lowered ("like a low rider truck") and had a Kenwood brand stereo and amplifier inside. It also had distinctive deep-dish tire rims, each bearing small decorative holes and custom painted red to match the truck. The rims were locked on the axles except for the front left rim. On November 11th, a little before 9:00 p.m., Christina left her home to take her cousins, who had been visiting, to her sister's apartment. She took her sister's car but soon returned, complaining the brakes were not working well. Her husband told her to take

his truck instead. She planned to stop at Dairy Queen for a snack on the way back but had no money, so Joe gave her a $50 bill because it was the smallest bill he had. She then left in the truck.

Christina went to her parents' home in Riverside but left with her sister around 9:00. She had a quick meal with her sister at a restaurant and then drove alone in the red truck towards the Dairy Queen in Riverside. The car containing defendant, Fields, Bender and P. M. was traveling in the opposite direction when defendant saw the rims on Christina's truck and exclaimed, "Those are the ones we need." They made a U-turn and followed the victim for two traffic lights. Christina eventually stopped for a red light, and Bender stopped directly behind her. According to P. M.'s testimony, defendant jumped out carrying a .38-caliber pistol, ran to the driver's side of the red truck, and fired one shot through the window, shattering it. He then pulled Christina out and got into the truck from the driver's side. Fields also jumped from Bender's car at this time, ran to the passenger side of the truck and got in. Both the Cutlass, now with just Mark Bender and P. M. inside, and the red Nissan truck, driven by defendant with Fields as a passenger, then left the scene. They met later at Perry Bender's house.

Juan Williams was in a brown Mercedes-Benz, stopped at the red light directly behind Mark Bender's Cutlass. He saw only one man run up to the driver's side of the red truck. He described the assailant as a young Hispanic male, between five feet three inches and five feet six inches tall. The assailant threw the victim from the truck and then drove off in it. Williams testified he did not see a second man enter the truck on the passenger side, although a police officer testified later in the trial that Williams told him the night of the murder that he had seen two men run up to the truck.

Rena Stanfill was in a Ford Bronco behind Williams's Mercedes. She was about 30 to 35 feet from the crime. She described the car in front of the Mercedes as a medium-sized American car. In front of that car was a red or maroon pickup truck. She saw two men alight from the American car and run to the red pickup truck. One man, an African-American about five feet 10 inches tall,[1] ran to the driver's side and pulled a woman from the truck; the victim struck the pavement face first. The second man, who was either Hispanic or African-American, jumped into the passenger side of the truck. The two men then left the scene in the truck, followed by the American car. Stanfill, who was driving with her windows rolled up and the radio turned on, did not hear a gunshot.

Christina Ramirez suffered a single gunshot wound to the neck. The bullet entered the left side of her neck and traveled downward, injuring and lodging

---

[1] Both defendant and Broderick Fields are African-American and stand approximately six feet tall.

in her spine. She did not die immediately, but expired on December 21, 1988; the gunshot wound was the cause of death. The bullet recovered from her body was consistent with having been fired from a .38-caliber handgun.

Around 11:45 that night, Mark Bender, with Fields and P. M., arrived in the Cutlass at Perry Bender's home. (Perry is Mark Bender's brother.) Mark was visibly upset; inside Perry's home, he blurted out: "I know he shot her. I know she is hurt bad." He was referring to defendant. Around midnight, defendant arrived in the Ramirezes' red truck, playing loud music on the stereo. He had a .38-caliber handgun. When Perry asked him how he obtained the truck, he said he got it in Riverside and that he "[s]moked the bitch." Perry saw defendant rifling through a woman's purse; defendant found $50 in it.

Sometime between 11:00 p.m. and 1:00 a.m., Timothy Gardner, Levi's brother, saw defendant in front of Harb's Liquor Store/Market.[2] He was sitting in a red minitruck with a camper shell and deep-dish rims; the stereo was playing loudly. Defendant asked him where Levi Gardner was. He asked Timothy Gardner to tell his brother that he had some "deeps" for him.

Defendant apparently parked the truck in a secluded place in the hills of Mead Valley. On November 12th, he offered to sell a single deep-dish tire rim to Levi Gardner for $50. It was painted red and had circular holes in it. Gardner wanted to see all four rims before committing to the purchase, so they got in Gardner's truck and defendant directed him to a remote location in the hills. Down a dirt road, they came upon a red pickup truck with a camper shell. It had deep-dish rims, but was missing one from the front. Gardner had a "bad feeling" about the deal and declined to buy them. Defendant offered to lower the price if Gardner helped him remove the other three rims, but he declined.

Kevin Davis also saw the red truck in the Mead Valley hills sometime in November 1988. Defendant offered to sell him a Kenwood brand car stereo, amplifier and speakers, but he declined. He once saw defendant in the parking lot of a liquor store with a rim matching those on the victim's truck. He had also seen defendant with a .38-caliber handgun. Tony Dilleworth also testified that defendant tried to sell him a Kenwood brand car stereo, amplifier and speakers in November 1988.

Acting on a tip, the Riverside Sheriff's Department located and towed the victim's truck from the hills. It was missing one wheel and all of its stereo

---

[2] Timothy Gardner did not specify that this incident occurred on the night of November 11th, merely saying it was in November 1988.

components. Heavy scratch marks around the lug nuts suggested someone had used the wrong tool to try and remove the remaining wheels. Police found a small amount of blood in the doorjamb on the driver's side. Defendant apparently blamed Rick Kinney, an acquaintance, for the truck's disappearance from the hills. He later confronted Kinney, saying: "Where's my truck at? I took that truck that you're riding around today, that red truck in the hills, that was mine." Manny Kelly, who was with Kinney at the time, overheard this conversation.

The day after the crime, a crowd of people, including defendant and Andrew White, were gathered in the early evening in front of a liquor store. According to White, defendant described for the group how he acquired the red pickup truck, saying he "smoked the bitch." When people in the group expressed skepticism at this account, defendant swore it was true and invoked his gang, Fruit Town, as proof it was true. Defendant asked White to help him remove the rims from the truck and, although White had experience in such things because he had been a car thief, he declined because he had heard that defendant had shot a person in order to obtain the truck.

### B. *Penalty Phase*

The prosecution's case in aggravation consisted of evidence of eight different violent crimes defendant had committed, as well as victim impact evidence.

On January 12, 1988, Flecia Bennett lived with defendant and their two children. She wanted to buy some cigarettes at the store. Defendant did not want her to go and socked her in the mouth, drawing blood. In response, Bennett hit him in the head with a chair. Defendant produced a .38-caliber handgun and, pointing it at Bennett's face from a distance of two feet, said, "Bitch, I'm going to kill you."

On January 27, 1988, Sharon Lee Baker was working as the desk clerk at the University Lodge in Riverside. Defendant walked up to the front desk, produced a large knife, called Baker a "bitch," and ordered her to give him all her money or he would kill her. She said the bartender would be returning soon and defendant should leave. He left but promised to come back with a gun to kill her. He came back a few days later with a woman and two children, trying to rent a room. The police were called, and defendant was arrested.

On November 5, 1988, six days before Christina Ramirez was shot, defendant, Broderick Fields, P. M. and Mark Bender were out driving when they saw an Oldsmobile Cutlass Supreme with straight lace rims at a gas

station. The car was occupied by two teenagers, Gloria A. and Monica R.; the driver, 20-year-old Danny Alcaraz, was looking under the hood. Defendant pointed a .38-caliber handgun at the girls and ordered them out of the car. They fled, and defendant jumped into the car and drove away. Defendant traded the rims to Mark Bender in exchange for a black Ford Pinto. Andrew White saw the straight lace rims on Bender's car, but Bender later removed them. The rims were recovered from Bender's residence. The Oldsmobile was found in a hilly area of Mead Valley; the tires and stereo system were missing.

On November 14, 1988, three days after Christina Ramirez was shot, Danny Coria was riding around with his friend Simon Mireles. Coria was driving his Suzuki Samurai with expensive deep-dish chrome rims. He stopped at a park, whereupon a Chevy Blazer or Jimmy appeared; Willie Woods was the driver, and defendant was in the front passenger seat. One of them yelled, "Get out," and then a shot was fired, striking Coria in the arm and breaking it. One of the robbers opened the door of the Suzuki, and both Coria and Mireles fled on foot. Although Coria identified Woods as the shooter, he was unsure by the time of defendant's trial and thought defendant was the shooter. Woods testified that, although he had pleaded guilty to the crimes against Coria, defendant was the one who actually fired the shot that struck Coria in the arm. The trial court took judicial notice that the transcript of Woods's plea hearing showed Woods never denied the charges that he attempted to murder and rob Coria, or that he personally used a firearm in those crimes.

The very next day, on November 15, 1988, Francisco Carillo drove to Castle Park in Riverside with his brother Silvester Carillo and three others. Carillo was driving his 1979 Grand Prix, which had been lowered. They left the park around midnight. A Chevy Blazer, driven by Willie Woods with defendant in the front passenger seat, pulled alongside. Defendant jumped out and shot Francisco Carillo in the arm, the bullet passing through his chest and heart. Francisco slumped forward and stepped on the gas. Another shot rang out. Silvester was able to steer the car and drive away. Kevin Davis, who was also in the Blazer, positively identified defendant as the shooter. Francisco Carillo died from a single gunshot wound; forensic evidence showed the weapon had been fired from less than three feet away, and possibly as little as 16 inches away.

Maria Ramirez, Christina's mother-in-law, testified that nothing in her family was the same after Christina's murder. Her son, Joe, became severely depressed, stopped going to work, and obtained several guns. He stayed in his bedroom for nearly a year, coming out only to eat and go to the bathroom. He threatened suicide once, and displayed a lot of anger, punching holes in walls

and doors. He blamed himself for Christina's death. Maria and her husband never went far from home because they had to keep watch on their son. She had him committed for observation and counseling, but this did not help because her son was such a private person. Once, when she was late coming home, he was literally shaking and crying, overcome by the possibility that she had been shot. His entire personality had changed, and he was overcome with fear. Maria Ramirez said her son was doing better by the time of trial; he had rid himself of his guns and was taking classes to become a firefighter. He did not like to testify in court because he wanted to focus on the future and not the past. When asked whether her son still had fears "to this day," she replied, "Yes, they'll be with him for his lifetime."

Christina Ramirez's mother, Susie Barraza, also testified. She stated that Christina was an easygoing girl who had a lot of friends. She met Joe, and they decided to marry although Joe was only 19 years old and Christina only 17 years old. They got married in Las Vegas on October 15, 1988, less than a month before the shooting. A wedding reception had been planned for November 12th; Christina was shot the day before. Mrs. Barraza had a hard time coping with her daughter's death and started therapy, which continued at the time of trial. She was afraid to venture out at night and always had someone accompany her when she did go out.

Although defendant did not testify at the penalty phase, he called several witnesses. Their testimony apparently served one of two purposes. First, he called witnesses who attempted to raise a doubt as to his guilt of some of the uncharged offenses on which the prosecution relied for aggravating evidence. Second, he presented evidence relevant to his personal characteristics that might be considered mitigating, such as his deprived and violent childhood and borderline intelligence.

Raul Valadez testified he was in the car when Francisco Carillo was shot and that the gunman held the gun in his right hand. A police officer had previously testified defendant was left-handed.

Robert Hathaway, a detective for the Riverside Police Department, testified that Sharon Lee Baker had described her attacker at the University Lodge as a Black male, 35 to 40 years old, weighing approximately 200 pounds. When arrested, defendant was 18 years old and weighed 160 pounds. Hathaway testified that Baker was unable to identify her attacker from a photographic lineup.

William Palmer, a Riverside County probation officer, testified he interviewed Willie Woods when preparing the probation report following Woods's guilty plea to the attempted murder of Danny Coria. Woods told him that he

(Woods) was innocent and that he had not even been present at the scene of the crime, having spent that evening in a club and theater with friends. He knew the identities of the true culprits, however, and identified someone named "Torrey" as the actual gunman. Woods said he borrowed the stolen Suzuki from Broderick Fields, thereby explaining why he was in Coria's car when police arrested him.

Paul Sham, a criminalist employed by a California Department of Justice regional crime lab, testified he examined the rifling characteristics on the bullets recovered from Christina Ramirez, Danny Coria, and Francisco Carillo and concluded they had been fired from three different .38-caliber handguns.

Wesley Armstrong, defendant's uncle, testified and provided background information about defendant's childhood. Lula Armstrong McMaryion was his mother, defendant's grandmother. He had several siblings, one of whom was Catherine Armstrong Williams, defendant's mother. When defendant was young, he was in the care of his mother. Once, when defendant was five or six years old, Armstrong went to Catherine's apartment to pick defendant up and take him to McMaryion's home for babysitting. Armstrong found defendant alone in the apartment, in a dark closet with the door closed. Armstrong surmised that defendant had been crying because his eyes were swollen. On the drive to McMaryion's home, defendant appeared to be in pain. Armstrong lifted defendant's shirt and discovered he had bruises and open wounds on his back, as though he had been whipped with an electrical cord or a clothes hanger. Defendant was later removed from his mother's custody and placed first in foster care, then with his grandmother. McMaryion was very lenient with defendant, explaining that because defendant had been abused as a child, she did not want to impose too much discipline on him. Armstrong wished to remove defendant from his mother's home in Compton and have him come live with him in Cerritos because the neighborhood in Compton was getting very rough, with a lot of gang activity. Defendant stayed with McMaryion until his teenage years. Armstrong loved his nephew.

Armstrong's account of defendant's young life was confirmed by defendant's mother, Catherine Williams. Williams testified she was 16 years old when she gave birth to defendant. His father was Oscar Brown, with whom she lived for a time. They would fight, and he struck her several times in defendant's presence. She left him after he shot her while she was holding defendant. When defendant was about three years old, she was advised defendant was a hyperactive child, but she did not seek any treatment or medication for him. When she was 19 years old, she took a parenting class and attended some therapy sessions in an attempt to regain custody, but she was unsuccessful. She did not approve of defendant living with her mother

because there was no discipline and the neighborhood was too dangerous. She did not recall whether she ever struck defendant.

Lula Mae Armstrong McMaryion, defendant's grandmother, testified that defendant came to live with her when he was five years old and stayed until he was 17 or 18 years old. When defendant was six, school authorities told her defendant could not sit still in class, but she never sought any treatment or medication for him. Confirming other witnesses' descriptions of the neighborhood, she testified she and defendant sometimes slept on the floor because they were afraid bullets would come through the windows. She testified she believed defendant was not guilty.

Angela Matthews testified she was defendant's cousin, she was close to him, she loved him and she did not want to see anything happen to him.

Geneva Cofield was defendant's foster mother. She took custody of him when he was about five years old, and she confirmed he had welts and cuts over a large percentage of his body. Some of the injuries were old and some were new. He had wounds on his buttocks and back, as well as on his penis. He also had some cigarette burns on his body. She testified defendant told her that he had been beaten by a man named "RC" as well as by his mother, and that his mother would take his clothes away so he could not leave home. When Cofield first took custody of defendant, he was very skinny as if he were undernourished. He also suffered from diarrhea, so much so that she took him to the hospital. She was very fond of defendant, and he asked if he could call her "mama" and her husband "dad." She thought that if she had been allowed to keep custody of defendant, he would not be in the trouble in which he then found himself. She noticed that when defendant would obtain a toy, he would sometimes tear it up and bury it in the ground. As a result, she had defendant see a psychologist.

Kay Miller, Cofield's daughter, testified she was 17 years old when defendant came to their home as a foster child. Miller corroborated Cofield's account of defendant's injuries and his unhealthy appearance. Miller testified she enjoyed him as a foster brother and missed him when he was removed from the home. Mack Taylor, who was a children's services worker with the Los Angeles Department of Social Services, testified that his department's records corroborated Cofield's account of defendant's childhood injuries. Taylor also testified that he became involved in the case when defendant was 12 years old, that defendant's mother, Catherine Williams, wished to regain custody of defendant, but that his grandmother, Lula McMaryion, opposed a change in custody. The resulting conflict between defendant's mother and grandmother caused defendant to experience a lot of stress.

Dr. Chin Choo testified she was a resident in psychiatry at the Martin Luther King Medical Center when, on January 16, 1987, defendant, then 17 years old, was admitted into the emergency room. He was delusional and disoriented, with impaired memory, rambling speech and inappropriate affect. He was also paranoid, saying "the Crips are after me." He had poor impulse control, suicidal/homicidal ideation tendencies, and appeared to be responding to internal stimuli. Because of his apparent psychosis, he was placed in four-point restraint for his own protection and that of others, and prescribed Haldol, a psychotropic medication. Defendant admitted to smoking Sherman cigarettes, that is, cigarettes laced with phencyclidine (PCP). By January 19th, his condition had improved and he was released. Dr. Choo testified on cross-examination that defendant's psychosis could have been caused by ingesting PCP.

Dr. Nancy Kaser-Boyd, a clinical psychologist, testified that defendant was one of the most physically abused children she had ever seen. In addition to the beatings and burnings, she opined that he was subjected to psychological abuse, such as being isolated in a dark closet, deprived of his clothes, beaten while he was naked, and being allowed to watch while his mother was beaten. Being removed from his mother's custody, not really knowing his father, and then seeing his mother and grandmother fight over custody all contributed to his profound feelings of vulnerability, anxiety, and depression. Such children are at higher risk for drug and alcohol abuse. The witness noted that defendant reported waking in the night and worrying someone was coming to get him; she likened defendant's experience to posttraumatic stress disorder. These experiences also led to arrested emotional development which, coupled with his probable hyperactivity as a child, his low intelligence (Dr. Kaser-Boyd testified defendant had an IQ of 77), and his having attended six different schools between the seventh and 11th grades, all contributed to his poor academic performance. Dr. Kaser-Boyd testified that defendant should have been in special education, but his guardian, his grandmother, was not sophisticated enough to attend to defendant's special needs.

Defendant's two aunts (Louise Matthews and Mary McGowan), his girlfriend (Flecia Bennett), and a high school principal (Carl Phillips) also testified on defendant's behalf, as did Professor James Johnson, who described the community in Compton where defendant had grown up.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Admission of Broderick Fields's Out-of-Court Statements*

##### a. *Facts*

Juan Williams testified for the defense. He stated he was in a brown Mercedes-Benz behind the victim's truck when the crime occurred. He observed a "slight[ly] built Hispanic [man]" go from the passenger side of the car in front of him to the driver's side of the pickup truck, pull the female driver out, and throw her to the street. Williams was at most "two car lengths" from this scene. The Hispanic-looking man then entered the driver's side of the truck and drove off. Williams did not see a second man. This testimony tended to undermine the testimony given by another eyewitness, Rena Stanfill, who testified that while seated in the car behind Williams's car, she saw *two* men run up to the victim's truck, one on each side, and that *the African-American man* went to the driver's side while the man who could have been either Hispanic or African-American went to the passenger side of the truck. Defendant is an African-American; the second man, alleged to be Broderick Fields, is a medium-to-dark-complected African-American male standing between 5 feet 11 inches to six feet one inch tall.

The prosecution sought to cast doubt on Williams's testimony by calling Detective Esquivel to testify in rebuttal to a statement Broderick Fields had made to him in an out-of-court interrogation. Defendant objected, claiming admission of Fields's out-of-court statements to Detective Esquivel would violate the *Aranda/Bruton* rule[3] and his Sixth Amendment right to confront and cross-examine the witnesses against him, and that the statements did not comprise proper impeachment or a proper declaration against penal interest excepted from the hearsay rule under Evidence Code section 1230. The trial court rejected these objections, the first two impliedly, the latter two expressly. Before Esquivel testified, the trial court cautioned the jury that Esquivel's testimony was for the limited purpose of impeachment. Detective Esquivel then testified he interrogated Fields on January 13, 1989. Fields admitted to him he was in Mark Bender's car, directly behind a red truck on the night of the crime; he said that he got out and went to the passenger side of the truck, entered the truck, and left the scene in the truck. Nowhere in Esquivel's recounting of Fields's statements did he reveal defendant's name or indicate defendant was the person who entered the victim's truck from the

---

[3] *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]; *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].

driver's side, although the implication was that someone did so and drove it away with Fields sitting in the passenger seat.

### b. *Discussion*

Defendant raises both constitutional and statutory arguments against the admission of Esquivel's testimony recounting Fields's out-of-court statements. "It is well established that 'we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us.'" (*People v. Leonard* (1983) 34 Cal.3d 183, 187 [193 Cal.Rptr. 171, 666 P.2d 28].) Accordingly, we first address defendant's statutory arguments. (See *People v. Duarte* (2000) 24 Cal.4th 603, 610 [101 Cal.Rptr.2d 701, 12 P.3d 1110].)

Defendant first contends the trial court erred by admitting Esquivel's testimony because the evidence was not relevant to impeach Juan Williams's testimony. (Evid. Code, §§ 785 ["The credibility of a witness may be attacked or supported by any party, including the party calling him"], 210 [defining "relevant evidence"].) At the threshold, respondent argues that defendant did not object on the ground of relevance and thus should be held to have forfeited this issue for appeal. Although defendant did not register a formal and specific objection on relevance grounds, he did complain the proposed testimony was not proper impeachment. The trial court spoke as if it were deciding the question of relevance, once stating that "[i]t looks to me as though this [evidence] is relevant" and later saying it found "the area of inquiry is relevant for rebuttal [of Juan Williams]." Defendant may thus have believed his objections in limine were understood by the trial court to encompass the issue of relevance. We conclude the issue is properly before us.

Turning to the merits, we note Williams testified he saw one man, a slightly built Hispanic, go to the driver's side of the victim's truck. Defendant claims Fields's out-of-court statement that he (Fields) went to the passenger side door of the same truck does not undermine or impeach Williams's testimony. Neither defendant nor respondent apprehends, however, that Williams also testified he *did not* see a young African-American man enter the truck from the passenger side.

"As with all relevant evidence, however, the trial court retains discretion to admit or exclude evidence offered for impeachment. [Citations.] A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

Williams's ability accurately to perceive and recall is certainly called into question if, from a distance of "[a]t the most two car lengths," he did not see the second man. Although, as defendant points out, there could be some reasonable explanation for Williams's failure to see the second man, that possibility is insufficient to establish that the trial court's decision to admit Fields's extrajudicial statements was arbitrary or capricious. Accordingly, we conclude the trial court did not abuse its discretion in finding the evidence relevant.

Defendant next contends Fields's statement to Detective Esquivel was not a true declaration against Fields's penal interest and thus was not properly excepted from the hearsay rule by Evidence Code section 1230. That section provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (*Ibid.*)

We addressed the procedural prerequisites for the declaration-against-penal-interest exception to the hearsay rule in *People v. Duarte, supra,* 24 Cal.4th 603. There we explained that in order to qualify for admission, "[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*Id.* at pp. 610–611.) ▮ The first prong of this test is satisfied because the parties stipulated to Fields's unavailability, possibly because he had exercised his privilege against compelled self-incrimination. (*Id.* at pp. 609–610.)

Defendant claims Fields's statements to Detective Esquivel fail the second part of the test because the prosecution, as the proponent of the evidence, failed to establish that Fields's statements were truly contrary to his penal interests. Defendant argues the transcript of the interrogation indicates Fields "clearly tried to distance himself from being the shooter" and that he "denied having any knowledge that a crime had been committed." We disagree with defendant's selective reading of the record.

During the hearing to determine the admissibility of Fields's statements, the trial court read into the record part of the transcript of Fields's interrogation by Detective Esquivel. It indicates Detective Esquivel informed Fields he

was under arrest for suspicion of murder and that Fields said he saw a person run to the other side of the truck *with a gun*.[4] Fields told Esquivel he heard a gunshot, although defendant denied to Fields that he shot the victim, saying he shot out the window and the victim fainted. Fields admitted he went to the passenger side of the truck and got in, resignedly exclaiming: "I mean, fuck it, and that's how it went." The trial court concluded Fields's statement was "reasonabl[y] against his penal interest. He doesn't want to do any time but I think it's fairly obvious he isn't going to walk out of there. He is under arrest." On these facts, we conclude the trial court did not abuse its discretion in finding Fields spoke to Esquivel knowing his statements were against his penal interest. Although he does not admit to firing the fatal shot, he knew he was being charged with murder, he admitted to hearing a gunshot, and he admitted to participating in stealing the victim's truck. These statements were clearly against his penal interests; his denial of having been the shooter did not absolve him of the crimes to which he admitted. By admitting he entered the car and assisted defendant in fleeing the scene, he was admitting his complicity in a robbery murder, an admission "so far contrary to the declarant's interests 'that a reasonable man in his position would not have [admitted it] unless he believed it to be true.' " (1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 146, p. 857, quoting Evid. Code, § 1230; *People v. Duarte, supra*, 24 Cal.4th at pp. 610–611; see *People v. Fuentes* (1998) 61 Cal.App.4th 956, 961 [72 Cal.Rptr.2d 237].)

Defendant also contends Detective Esquivel's testimony as to Fields's statements fails the third requirement for admissibility because the prosecution did not show the evidence was sufficiently trustworthy to permit its admission without having the declarant subject to cross-examination. "To determine whether the declaration passes the required threshold of trustworthiness, a trial court 'may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 607 [25 Cal.Rptr.2d 390, 863 P.2d 635].) ▮ The trial court found the evidence bore sufficient indicia of trustworthiness, a decision we review on appeal for abuse of discretion. (*Ibid.*; *People v. Gordon* (1990) 50 Cal.3d 1223, 1250–1251 [270 Cal.Rptr. 451, 792 P.2d 251].)

As noted, there was evidence from which the trial court could reasonably conclude Fields knew his statement was against his penal interest: He knew defendant had a gun, he knew defendant ran up to the victim's truck, he knew defendant fired the gun and pulled the victim from her truck, and he

---

[4] Fields initially denied seeing a gun, although he admitted hearing a gunshot. Later, he admitted seeing the gun.

knew they were stealing the victim's truck. Although he denied personally committing the murder, he did not attempt to cast blame for the murder on defendant, repeatedly saying he did not know if the victim had died, and that defendant had told him he merely shot out the window and the victim fainted as a result. This was thus not a case in which Fields admitted to some culpability in order to shift the bulk of the blame to another. Although he did say defendant had a gun, his story nevertheless admitted he and defendant were relatively equally to blame. Like the trial court, we conclude the circumstances surrounding Fields's statement indicate it "was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Cudjo*, *supra*, 6 Cal.4th at p. 607.) The trial court therefore did not err in ruling the evidence was admissible under Evidence Code section 1230.

There being no statutory basis to find the trial court erred in admitting Detective Esquivel's testimony recounting Fields's out-of-court statements, we turn to defendant's constitutional arguments. Defendant first contends admission of Esquivel's testimony violated the *Aranda/Bruton* rule. (See *ante*, fn. 3.) We must reject this contention at the threshold. The *Aranda/Bruton* rule addresses the situation in which "an out-of-court confession of one defendant . . . incriminates not only that defendant but another defendant *jointly charged.*" (*People v. Fletcher* (1996) 13 Cal.4th 451, 455 [53 Cal.Rptr.2d 572, 917 P.2d 187], italics added, fn. omitted.) "The United States Supreme Court has held that, because jurors cannot be expected to ignore one defendant's confession that is 'powerfully incriminating' as to a second defendant when determining the latter's guilt, admission of such a confession *at a joint trial* generally violates the confrontation rights of the nondeclarant." (*Ibid.*, italics added.) In this case, Fields was not jointly charged or tried with defendant, but was separately tried and convicted of murder. Accordingly, the *Aranda/Bruton* rule does not preclude admission of Fields's extrajudicial statements against defendant.[5]

Defendant next argues his constitutional right to confrontation under the Sixth Amendment to the United States Constitution was violated by the admission of Fields's out-of-court statements to Detective Esquivel.[6] The

---

[5] In any event, even if Fields had been tried jointly with defendant, Fields's statement was not "facially incriminating" of defendant and so would not run afoul of the rule. (*Richardson v. Marsh* (1987) 481 U.S. 200, 207–208 [95 L.Ed.2d 176, 107 S.Ct. 1702].) The trial court here was careful to limit the prosecutor's examination of Detective Esquivel to ensure no mention of defendant would be made.

[6] Defendant also purports to rely on his right to a fair trial, to a reliable guilt and penalty phase determination, and to due process under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as "analogous state constitutional provisions." He invokes this constitutional authority for virtually every claim of error. Because he does not elaborate on these separate bases for relief, providing neither separate argument nor separate and relevant citation to legal authority, we decline to address these additional,

Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This federal constitutional right to confront adverse witnesses in a criminal prosecution applies to the states (*Pointer v. Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]) and is also guaranteed independently by the California Constitution (Cal. Const., art. I, § 15) and by statute (§ 686). The primary reason an accused is entitled to confront adverse witnesses is to permit cross-examination. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678 [89 L.Ed.2d 674, 106 S.Ct. 1431]; *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121 [99 Cal.Rptr.2d 149, 5 P.3d 203].) "[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law." (*Pointer v. Texas, supra,* at p. 405.)

"[T]he right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295 [35 L.Ed.2d 297, 93 S.Ct. 1038]; *People v. Cromer* (2001) 24 Cal.4th 889, 897 [103 Cal.Rptr.2d 23, 15 P.3d 243] ["Notwithstanding the importance of the confrontation right, it is not absolute"].) The high court has recently explained that admission of hearsay evidence is not inconsistent with the confrontation clause if such statements fall within a " 'firmly rooted hearsay exception' " or they contain " 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything to the statements' reliability." (*Lilly v. Virginia* (1999) 527 U.S. 116, 124–125 [144 L.Ed.2d 117, 119 S.Ct. 1887] (plur. opn.); *id.* at p. 140 (conc. opn. of Breyer, J.).) Because we have previously concluded that the evidence of Fields's out-of-court statements bore sufficient guarantees of trustworthiness, we find no confrontation clause violation occurred when the trial court admitted the statements into evidence.

Even, however, were we to assume the trial court erred by admitting Fields's statements, any error was harmless beyond a reasonable doubt (*Lilly v. Virginia, supra,* 527 U.S. at pp. 139–140) because the evidence of defendant's guilt was overwhelming. Eyewitness Rena Stanfill observed the crime and P. M. corroborated her account, identifying defendant. Defendant was linked to the stolen truck and its distinctive deep-dish rims in several ways. Andrew White heard him in front of Harb's Liquor Store/Market admitting he shot through the window of the victim's truck and pulled her out to the street before stealing her truck. Defendant also told Perry Bender he

essentially boilerplate, constitutional claims for this and the remaining issues. (*People v. Hardy* (1992) 2 Cal.4th 86, 150 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

"smoked the bitch," and Mark Bender, another eyewitness, told his sister-in-law that defendant hurt the victim. Although Detective Esquivel testified and recounted Broderick Fields's out-of-court statements, the account was sanitized, defendant's name was not mentioned, and the testimony was brief. Moreover, the jury was told the evidence was for the limited purpose of impeaching Juan Williams and was not to be used as substantive evidence of defendant's guilt. (See *post*, pt. II.A.2.) In sum, we find no constitutional error. We also find that, even if we assume error, it was harmless beyond a reasonable doubt.

2. *The Trial Court's Comment on Fields's Out-of-Court Statements*

Before permitting the jury to hear Detective Esquivel's testimony recounting Fields's extrajudicial statements, the trial court cautioned the jury, saying: "[T]his is to advise you and instruct you that the questions to be asked of Sergeant Esquivel are asked for the burden of proving and sole purpose[] of impeachment of any of the testimony of Defense Witness Juan Williams who was called yesterday and cannot be considered by you for any other purpose. You will be further instructed on that later but this is offered for the limited purpose of impeachment. It is impeachment of Juan Williams under the instructions that you will receive." Defendant contends the trial court violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous state constitutional guarantees, by commenting on the evidence in this manner.[7]

Defendant claims that the wording of the instruction improperly removed an issue from the jury. In particular, he contends that because the court instructed the jury that Detective Esquivel's testimony regarding Fields's statements "is impeachment of Juan Williams," rather than "is *for the* impeachment of Juan Williams," the court improperly commented on the evidence. Defendant magnifies the seriousness of this issue, for it appears the trial court merely misspoke, as evidenced by its earlier statements that the evidence was for "the sole purpose of impeachment" and for "the limited purpose of impeachment." In any event, even were we to assume error, it could have caused no prejudice. The jury was instructed that it should consider the instructions as a whole and that it was "the sole judge[] of the believability of a witness and the weight to be given to the testimony of each witness." More specifically, the court instructed the jury that "I have not intended by anything I have done or any questions I may have asked or by

---

[7] Although respondent argues defendant forfeited this claim by failing to object, we find defendant may properly raise the issue under section 1259, which provides in part: "The appellate court may also review *any instruction given*, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Italics added.)

any ruling I may have made to intimate or suggest what you should find to be the facts or that I believe or disbelieve any witness. If anything I have done or said has to so indicate [*sic*], you will disregard it and form your own conclusion." Further: "Do not conclude that because an instruction is given I am expressing any opinion as to the facts." Finally, Juan Williams was more seriously impeached by the testimony of Officer Robert Sayers, who testified that when he interviewed Williams the night of the murder, Williams reported seeing *two suspects* run up to the victim's truck. This was the essence of the impeachment value provided by Broderick Fields's statements to Detective Esquivel. Any irregularity in the trial court's limiting instruction was thus harmless.

### 3. *Hearsay Statements by Mark Bender*

Defendant next contends the trial court violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and analogous state constitutional provisions by admitting Julie Bender's testimony that she heard her brother-in-law, Mark Bender, implicate defendant in the murder. As we explain, the trial court properly admitted the evidence under the spontaneous utterance exception to the hearsay rule.

At the time of the crime, Julie Bender was married to Perry Bender. She testified that one night she saw defendant in a red pickup truck. Around midnight that same night, Mark Bender, her brother-in-law, came into her house. Mark was upset and started crying. He shook his head back and forth, and his body was shaking. He then said: "I know he shot her. I know she is hurt bad." When asked to whom he was referring, Mark replied, "Bam." "Bam" is defendant's nickname.

Just before Julie Bender testified on this point, defendant objected on hearsay grounds and the court held a lengthy hearing. The court eventually overruled defendant's hearsay objection, admitting the statement under the spontaneous utterance exception to the hearsay rule. Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." Defendant first contends the trial court abused its discretion in admitting the evidence because the declarant, Mark Bender, was no longer "under the stress of excitement caused by" witnessing defendant's crime. Defendant also contends that admission was improper because the declarant did not purport to be "narrat[ing], describ[ing], or explain[ing] an act, condition, or event [he] perceived." ▮ Both of these arguments

depend on a determination of preliminary facts by the trial court; such determinations will be upheld if supported by substantial evidence. (*People v. Phillips* (2000) 22 Cal.4th 226, 236 [92 Cal.Rptr.2d 58, 991 P.2d 145].)

"When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity. [Citations.] But as we emphasized in *People v. Washington,* 'Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*' " (*People v. Poggi* (1988) 45 Cal.3d 306, 319 [246 Cal.Rptr. 886, 753 P.2d 1082], quoting *People v. Washington* (1969) 71 Cal.2d 1170, 1176 [81 Cal.Rptr. 5, 459 P.2d 259], italics added in *Poggi.*) The trial court noted the declarant, Mark Bender, was crying, shaking and visibly upset when he made the statement, explaining: "He is still reacting to the events himself by objective manifestation." The court was well aware that the passage of time was relevant to the spontaneity of the statement, but nevertheless concluded the statement satisfied the statutory requirement of spontaneity.

Substantial evidence supports the trial court's ruling. Although Mark Bender's statement was made about two and one-half hours after the crime, that fact is not dispositive of the issue. (See *People v. Raley* (1992) 2 Cal.4th 870, 893–894 [8 Cal.Rptr.2d 678, 830 P.2d 712] [statement made 18 hours after event held spontaneous under Evid. Code, § 1240].) "The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant. . . . [U]ltimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter." (*People v. Farmer* (1989) 47 Cal.3d 888, 903–904 [254 Cal.Rptr. 508, 765 P.2d 940], overruled on another point in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].) Here, the facts available to the trial court amply justify its conclusion that the declarant continued to labor mightily under the emotional influence of the disturbing events he perceived, so much so that he could not stop his body from shaking nor stem the flow of tears.

We reach the same conclusion regarding defendant's argument that the declarant did not purport to be describing an event he personally witnessed. Evidence indicates Mark Bender was in the driver's seat of the car directly

behind the victim's truck when defendant shot her. His view of the scene was as clear as any of the witnesses', and he no doubt saw what other witnesses reported: Defendant went up to the driver's side of the truck and pulled the victim out, her body hitting the street face first. Although Bender's statement ("I know he shot her. I know she is hurt bad") does not unquestionably carry the inference that he spoke from personal knowledge of having actually seen defendant pull the trigger, neither does the statement purport to be a repetition of something Bender had heard from someone else. Although closer than the question of spontaneity, we conclude that, under the circumstances, there is substantial evidence to support the trial court's decision that Bender purported to be describing events he had personally seen.

Defendant also contends the trial court's ruling to admit the evidence violated his right to confrontation under the state and federal Constitutions because he was unable to cross-examine Mark Bender. Defendant's claim is meritless: "The hearsay exception for spontaneous declarations is among those 'firmly rooted' exceptions that carry sufficient indicia of reliability to satisfy the Sixth Amendment's confrontation clause. (*White v. Illinois* (1992) 502 U.S. 346, 355, fn. 8 [112 S.Ct. 736, 742, 116 L.Ed.2d 848] and accompanying text.)" (*People v. Dennis* (1998) 17 Cal.4th 468, 529 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

### 4. *Prohibiting Impeachment of P. M. with a Pending Juvenile Criminal Case*

Defendant next contends the trial court prejudicially erred, and also violated a number of his rights under the state and federal Constitutions, by prohibiting him from questioning P. M., a prosecution witness, about charges pending in juvenile court accusing P. M. of rape. As we explain, the trial court did not abuse its discretion.

#### a. *Facts*

P. M., 15 years old at the time of the crime, was by his own admission the fourth person in the car along with driver Mark Bender, defendant, and Broderick Fields. P. M. testified at the preliminary hearing[8] on February 21

---

[8] Concern arose at the preliminary hearing that P. M. was unrepresented and might incriminate himself at the hearing. The preliminary hearing was halted and the witness allowed to consult counsel. Once he was represented by counsel, the witness invoked his right under the Fifth Amendment to the United States Constitution not to answer further questions. The prosecution then granted him immunity, and he continued to testify.

and 24, 1989, and stated he saw defendant shoot the victim, Christina Ramirez, the driver of the red truck. In March 1990, several months after he testified at defendant's preliminary hearing, P. M. was charged in juvenile court with committing rape in January 1990, and that matter was still pending when defendant's trial commenced on November 18, 1991. The question arose at the beginning of defendant's trial whether P. M. could be impeached on cross-examination by asking him whether he expected some benefit in his juvenile rape case as a result of his favorable testimony for the prosecution in defendant's case.

The prosecutor, Mr. Pacheco, explained: "The rape case came much later, and [P. M.] has an attorney on that matter, and that's Mr. Burns, Michael Burns. I don't know what the disposition of that case is and I have stayed away from that case in all particulars. It's none of my business and I didn't want to do anything for [the witness] on that case. Mr. Burns has inquired about that and I told him I'm not doing anything about it."

He then elaborated: "I have deliberately not done anything for [P. M.] on that rape case. I was asked by Mr. Burns to do something for Mr. [M.] in some way, and I explained to Mr. Burns that if I did something for [him], then that certainly would be admissible on cross-examination of [P. M.], which would then allow counsel to get into his pending rape charge. [¶] If I didn't do something for [the witness] and he took that as an offense against himself and refused to testify, then, fine, he is unavailable as a witness and I have the opportunity to use his prior testimony. [¶] So I don't lose anything by not doing anything for [P. M.]. And that was the theory that I went through, or the thought process I went through, and nothing has been done for [the witness] in regard to this particular testimony. Nothing has been promised to [P. M.]. I haven't told Mr. Burns I would give him anything and I haven't told [the witness] that either. In fact, I've steadfastly gotten away from that, or stayed away from it."

Defense counsel accepted the prosecutor's assertions, but expressed concern that P. M. might subjectively believe he would benefit in his rape case if he cooperated and testified against defendant. In addition, counsel wondered whether P. M.'s attorney, Mr. Burns, his attorney at the preliminary hearing, Mr. Lomazow, or the prosecutor in the rape case, Mr. Hernandez, had promised P. M. anything. The trial court seemed disinclined to order those attorneys into a hearing, so defense counsel proposed a compromise: They would telephone Burns, Lomazow and Prosecutor Hernandez and attempt to discern whether any promises had been made. The court was amenable to that proposal, saying: "As I say, I'm not saying I wouldn't [hold a hearing]. And it may be appropriate." Accordingly, the matter was deferred.

The parties renewed the issue later in the trial. Before the prosecution called P. M. to the stand, his attorney, Mr. Burns, appeared and, out of the jury's presence, affirmed that "no offers have been made to [P. M.] . . . with regard to his pending case in juvenile court." Burns explained he had not formally requested any continuances, but had informally waived pretrial proceedings, and that although the 18 months the case had been pending was unusual, good cause had been shown for the continuances. For example, P. M. failed to appear "on at least four occasions." Burns asserted that if he thought it would have a positive effect on his client's disposition, he would bring P. M.'s cooperation in defendant's case to the attention of the juvenile court. He affirmed he would do anything in his power to see that his client served the least amount of time.

P. M. then testified out of the jury's presence. He confirmed that no one told him his testimony against defendant would benefit him in his own rape case. Similarly, he did not think he would suffer any detriment if he declined to testify against defendant. When asked on cross-examination whether he expected to get a benefit from testifying, he replied in the negative.

The trial court eventually ruled that "the nature of the pending proceedings against [P. M.] are not relevant to cross-examination on credibility. I will not preclude . . . defense counsel from asking [him] . . . whether he expects any benefit from his testifying here today, whether he expects any benefit from the People in any respect, if they wish to ask that question. They're not obligated to. [¶] But in terms of getting into the fact that there's a juvenile pending proceeding against him and the nature of the charges and that, I think the probative value on credibility is rather minimal and it's greatly outweighed by possible prejudice in this case to the People, undue prejudice to the People." The court also noted its "greatest concern" was the "consumption of time" in proving whether P. M. was correctly charged with rape. The trial court specifically cited Evidence Code section 352 as a basis for its decision. P. M. eventually testified before the jury that he saw defendant shoot through the window of the truck, pull the victim out, get in and drive away in the truck.

b. *Discussion*

Defendant contends he was denied his constitutional right to cross-examine P. M. by the trial court's ruling prohibiting him from raising the pending rape charges as evidence of the witness's motive for testifying. ■ As a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias. (*People v. Duran* (1976) 16 Cal.3d 282, 294 [127 Cal.Rptr. 618, 545 P.2d 1322]; Evid. Code, § 780, subd. (f) ["the

court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including . . . [¶] . . . [¶] (f) The existence or nonexistence of a bias, interest, or other motive"].) Contrary to defendant's assertion, however, his right to cross-examination is not a matter of "absolute right." Although we have said that "[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude" (*Curry v. Superior Court* (1970) 2 Cal.3d 707, 715 [87 Cal.Rptr. 361, 470 P.2d 345]), such latitude does not "prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance" (*People v. Box* (2000) 23 Cal.4th 1153, 1203 [99 Cal.Rptr.2d 69, 5 P.3d 130]; see *Delaware v. Van Arsdall, supra,* 475 U.S. at p. 679). ■ Moreover, reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination. (See generally *People v. Ramos* (1997) 15 Cal.4th 1133, 1166 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

The trial court held a hearing on the question whether promises had been made to P. M. Prosecutor Pacheco persuasively denied any such promises. The witness's attorney, Mr. Burns, also denied anyone had made such promises. P. M. himself denied the existence of such promises and also denied entertaining the subjective belief that he would enjoy any benefits. The decision on admissibility had been deferred to allow defense counsel time to inquire of the prosecutor in the rape case about any promises of leniency, but defense counsel produced no such evidence at the renewed hearing. No doubt the trial court was also aware that P. M. had testified against defendant at the preliminary hearing, before P. M. had allegedly even committed the rape. At that hearing, he would have had no incentive to seek a benefit for a case that did not yet exist. Under the circumstances, we find the trial court did not abuse its discretion in concluding that, under Evidence Code section 352, any slight impeachment effect of the remote possibility the witness was testifying in hopes of leniency was outweighed by the undue consumption of time such questioning would entail. This routine application of state evidentiary law does not implicate defendant's constitutional rights.[9] "[U]nless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' (*Van Arsdall, supra,* 475 U.S. at p. 680 [106 S.Ct. at p. 1436]), the trial court's exercise of

---

[9] Defendant further contends that even if the impeaching value of the rape charges was remote, it was for the jury to evaluate and not the trial court. He is mistaken. (*People v. Dyer* (1988) 45 Cal.3d 26, 48 [246 Cal.Rptr. 209, 753 P.2d 1] ["The trial court, not the jury, determines at the outset whether the evidence is relevant"].)

its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye* (1998) 18 Cal.4th 894, 946 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

Even were we to assume the trial court erred, we find any error was harmless beyond a reasonable doubt. (*Delaware v. Van Arsdall, supra*, 475 U.S. at p. 684 [applying the reasonable doubt standard]; *People v. Price* (1991) 1 Cal.4th 324, 423 [3 Cal.Rptr.2d 106, 821 P.2d 610] [same].) P. M.'s testimony was largely consistent with that of other witnesses, and defendant's guilt was also supported by evidence of his involvement with the stolen truck, the attempt to remove the locked rims, and his admissions to other persons. For example, he told a group of people how he "smoked that bitch," shot through the truck window, pulled a woman out and threw her to the ground, and then drove off in her truck. Under the circumstances, we find any error in excluding evidence of P. M.'s rape charges harmless beyond a reasonable doubt.

### 5. Evidence of Gang Affiliation

Andrew White testified at defendant's preliminary hearing and claimed he was present in front of a market when defendant admitted he "smoked that bitch" for her truck. Further, according to White, defendant "said that he put this on Fruit Town, that he was gonna put this on Fruit Town, Blood . . . ." He explained that Fruit Town was the name of defendant's gang and that by saying he was going to "put this on Fruit Town," defendant was swearing an oath of similar solemnity to having sworn on the memory of his mother. Before trial, defendant sought to exclude any reference before the jury to Fruit Town or to his taking an oath on his gang. The trial court made a tentative ruling finding the evidence admissible, except for the reference to the notorious street gang, the Bloods, which White had mentioned at the preliminary hearing.[10] In his opening statement, the prosecutor stated that defendant told witnesses he had "smoked the bitch" and swore to the truth of his assertion by invoking Fruit Town, his gang.

Defendant contends the trial court's failure to limit the prosecutor's use of this evidence violated his constitutional rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous state constitutional guarantees. We reject the constitutional claims at the threshold, for we find defendant failed to preserve these issues for appeal by failing to object on the state and federal constitutional grounds now asserted.

Setting aside the constitutional claims, we also understand defendant to contend that the trial court erred under Evidence Code section 352 by ruling

---

[10] Fruit Town is apparently a "set," or subset, of the Bloods street gang.

the evidence was admissible. Although defendant raised this issue in limine, respondent claims defendant failed to preserve this claim for appeal because he did not renew his evidentiary objection at trial. The general rule is that "when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal" (*People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3 [251 Cal.Rptr. 278, 760 P.2d 475]), although a sufficiently definite and express ruling on a motion in limine may also serve to preserve a claim (*People v. Ramos, supra*, 15 Cal.4th at p. 1171). We need not resolve the point, for we find respondent's claim unfounded. Following the trial court's in limine ruling, which it expressly said was tentative, defense counsel asked if "the Court could reconsider [later in the trial] whether the testimony is so inflamed at that point that this [evidence of defendant's gang] is simply cumulative and not of any additional probative value in light of the prejudice, I'd ask the Court to consider it at that time." The trial court replied: "I would do so when you make your objection because we will have heard the evidence in the actual trial setting and we'll be better able to evaluate the probative value and effect on the jury at that time than now. I agree." Just before calling Andrew White to the stand, defendant renewed his objection, which, after some discussion, the trial court again denied. We find defendant adequately preserved the Evidence Code section 352 claim for appeal.

Turning to the merits, we conclude the trial court did not abuse its discretion in admitting the Fruit Town evidence. (*People v. Gurule* (2002) 28 Cal.4th 557, 654–655 [123 Cal.Rptr.2d 345, 51 P.3d 224] [alleged violations of Evid. Code, § 352 tested by abuse of discretion standard].) "We have recognized that admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." (*People v. Williams* (1997) 16 Cal.4th 153, 193 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Here, the risk was minimal. The evidence of defendant's gang membership was not extensive, and the trial court took pains to exclude any reference to the Bloods, which might well have been more prejudicial and served little purpose. Admission of defendant's Fruit Town reference, on the other hand, was very probative, serving to assist the jury in determining whether defendant's statement that he shot the victim was mere braggadocio or a true statement of fact. By swearing to its truth on his gang, defendant himself distinguished his statement from mere bravado. The trial court thus did not abuse its discretion in admitting the statement over defendant's Evidence Code section 352 objection.

### 6. *Evidence of Defendant's Nickname*

Defendant's nickname was Bam Bam or simply Bam. He contends the trial court prejudicially erred by permitting the prosecutor to elicit and use this nickname. We disagree.

Defense counsel moved in limine to prevent the prosecutor from referring to, or eliciting from witnesses, that defendant's nickname was Bam or Bam Bam. The apparent basis of the objection was both Evidence Code section 352 and relevance. The prosecutor protested, arguing that some of the witnesses knew defendant only by his nickname. The trial court observed the nickname "has some negative connotations. 'Bam' might have a connotation associated with weapons. When a gun is fired it goes—some people describe it as going 'bam.' " After further argument, the trial court announced that "[b]asically I'm going to grant [the defense] request as to [the prosecutor] using that name, but I don't know whether it's going to be possible to completely instruct witnesses who may only know him as I heard Bam say this or Bam did that and say and describe [defendant] as that person." (Evidence adduced later, at the penalty phase, established that defendant's nickname was bestowed during his childhood and was a reference to the Flintstones cartoon character of the same name.)

The parties continued to discuss the issue. The prosecutor stated: "I can assure the Court that I won't emphasize or even unduly emphasize his nickname at all, and I will try to avoid it as much as possible. But the problem is some of these witnesses may have to be impeached with their prior statements, and in their prior statements they refer to the individual who committed the crime as Bam. And if we don't tell the jury the defendant is Bam, then the name Bam in the prior inconsistent statements means nothing. The jury might even think they're referring to somebody else." The trial court agreed the prosecutor should not emphasize the nickname but also recognized that it may be impossible to sanitize the entire trial of defendant's nickname. It instructed the prosecutor "not to use the word 'Bam' in framing a question unless it's necessary . . . to elicit a specific statement from a witness, a prior inconsistent statement or other statement that they're seeking to elicit." Recognizing that a witness may blurt out the nickname, the trial court informed the parties that "if it comes out inappropriately and there's a motion to strike, I'll strike it." The court also suggested that if the prosecutor asked a witness about the nickname for no apparent reason, it would sustain an objection under Evidence Code section 352.

The prosecutor revisited the topic later in the trial and the parties discussed it again. The trial court reiterated its ruling that the prosecutor should not

emphasize the nickname, but that if using the nickname is "the only way a question can be asked," it would be permitted.[11]

Thereafter, when questioning witness Timothy Gardner, the prosecutor initially referred to defendant in neutral terms. The following colloquy then occurred:

"Q. [by the prosecutor] Okay. And what did you see when you walked up to the fence?

"A. [by witness Gardner] I seen Bam in the truck.

"Q. You said Bam?

"A. Yeah. I seen Bam in the truck.

"Q. Is that the defendant?

"A. Yeah.

"Q. Is that his nickname or something?

"A. Yeah. That's what I knew him as until everything happened."

The defense made no objection. In several subsequent instances, a witness used defendant's nickname without any encouragement by the prosecutor. In these instances, the prosecutor merely clarified that the person known to the witness as Bam or Bam Bam was defendant.

Two instances did not follow this pattern. In questioning witness Kevin Davis, the prosecutor asked: "[D]o you know a person by the name of Andrew Lamont Brown *or Bam*?" (Italics added.) The witness replied in the affirmative, and the defense made no objection. Finally, in questioning witness Manny Kelly, the following occurred:

---

[11] Defendant contends that "when pressed by the defense not to use the term 'Bam' or 'Bam Bam' the prosecutor refused." We find this statement is not supported by the record. Defense counsel, Mr. Cotsirilos, stated: "Your Honor, I think it's our request if wherever possible Mr. Brown be referred to as 'the defendant' or 'Mr. Brown' and it not be used as an inflammatory technique." The prosecutor, Mr. Pacheco, replied: "I will not do that." Although defendant claims this shows the prosecutor refused to agree to refer to defendant in neutral terms, the more reasonable reading of this passage is that the prosecutor said he would not use the nickname "as an inflammatory technique." This interpretation is consistent with the prosecutor's assertions throughout, as well as the trial judge's comment immediately after this passage: "Basically that's what I said before."

"Q. [the prosecutor] Did you know a person by the name of Bam Bam?

"A. [witness Kelly] No, I didn't.

"Q. Okay. Did you meet Bam Bam at some point?

"A. I had never met him before.

"Q. Did you see him at some point?

"A. Well, I saw a side view of him. That's the first—the most I ever seen of him.

"Q. Do you see Bam Bam here today here in Court?

"A. That would have to be him. I just seen a side view just for a minute of him. I didn't see his face or anything.

"Q. This person Bam Bam, you point to the defendant. Is this Bam Bam or not?

"A. I couldn't say it was. It's just a side view. I just saw like his cheek, you know."

There was no defense objection.

Respondent contends at the threshold that defendant forfeited this issue for appeal by failing to object each time a prosecution witness used the nickname, or when the prosecutor used the nickname. Although a defendant's motion in limine would satisfy the requirement of an objection if the court's ruling were sufficiently clear and express (*People v. Morris* (1991) 53 Cal.3d 152, 189–190 [279 Cal.Rptr. 720, 807 P.2d 949], overruled on another point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588]), the trial court's ruling on this subject lacked clarity. The court at first stated it was granting the defense motion, but it later backtracked, explaining that to prevent all the witnesses from blurting out defendant's nickname might be impossible. The court then cautioned the prosecutor to use discretion in questioning witnesses and invited defense counsel to object and move to strike in individual instances.

We need not decide whether defendant adequately preserved this issue because, even assuming the issue is properly before us, we find the trial court did not abuse its discretion. (*People v. Gurule, supra*, 28 Cal.4th at

pp. 654–655.) The court carefully weighed defendant's concern over the potentially prejudicial effect of the nickname with the prosecutor's assertion that many of the witnesses knew defendant only by that name. The court then reasonably concluded that it would be impossible to sanitize the entire trial of any references to the nickname, but instructed the prosecution to minimize its use in order to reduce any prejudice. Our review of the record supports these decisions; sometimes reference to defendant's nickname was necessary to render a witness's testimony understandable, but there was no gratuitous use of, or reference to, the nickname.

Defendant relies on two federal appellate court cases, but both are distinguishable. In *United States v. Grayson* (2d Cir. 1948) 166 F.2d 863, the court merely noted that charging the defendant in the name of his alias was improper, there being no question of his identity, although the error "would not . . . even remotely tend to justify a reversal." (*Id.* at p. 867.) Similarly, in *United States v. Beedle* (3d Cir. 1972) 463 F.2d 721, which defendant also cites, the court noted that use of the defendant's alias "served no useful end and could only prejudice [the defendant]." (*Id.* at p. 725.) By contrast, several witnesses in the instant case knew defendant primarily or exclusively by his nickname. Because defendant's identity was at issue, the trial court did not err in cautioning the prosecutor not to emphasize the nickname, but acquiescing in the inevitability that it would come out before the jury.

Even assuming error occurred, it was clearly harmless on the facts of this case. Except for the questioning of witness Manny Kelly, the prosecutor did nothing to elicit defendant's nickname. Indeed, the nickname came out in defense counsel's cross-examination of witnesses as well. These instances were brief, mild and factual and could not have been prejudicial.

Although the prosecutor's questioning of Kelly was different because he used the nickname several times in succession in his questioning, the references came in only after numerous witnesses had referred to defendant as Bam, and they could not have prejudiced defendant. We conclude that, even assuming the trial court abused its discretion, defendant would not have achieved a more favorable result in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[12]

---

[12] Because this issue concerns the mere admission of evidence that was not particularly inflammatory, we reject defendant's contention that admission of his nickname requires we test the error under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].

### 7. Alleged Prosecutorial Misconduct: Arguing Future Dangerousness, Alleged Griffin Error

In his guilt phase closing argument, Prosecutor Pacheco made the following comments: "Ask yourself what exactly [defense counsel] are . . . saying in their closing argument. What are they telling you? Did they tell you he didn't do it? No, they didn't tell you that. They told you basically [the evidence does not show guilt] beyond a reasonable doubt, be afraid, be fearful beyond a reasonable doubt. Well, [the applicable standard is] not beyond any doubt. The judge is going to tell you that. Remember, it's not possible to be perfect. If you apply a perfect standard to imperfect evidence, everybody is going to be acquitted. No one ever will be convicted. This man will walk free. This man will be out there in the streets with you and I." Defendant objected to this argument, asserting the argument was "improper" and asked that the jury be admonished. The trial court did not make an express ruling, merely stating: "I think counsel should argue the evidence rather than the consequences of the jury's decision. Let's stick with the evidence."

The prosecutor then continued: "If he wasn't there, where was he? Everyone else says he was there. Where was he? No alibi witness took the stand and said he was with me that night watching T.V. You didn't hear any of that, did you? All of the evidence points to one man. One man only. The defendant. Don't be afraid to convict him. You know he did it. We all know that he did it. It's up to you." The prosecutor ended his argument shortly thereafter.

Following the close of argument, defense counsel reiterated their objection to the prosecutor's comment that an acquittal would lead to defendant "being out in the street with the jury." The prosecutor informed the court that, for his argument, he was relying on *People v. Hughey* (1987) 194 Cal.App.3d 1383 [240 Cal.Rptr. 269]. Defense counsel then moved for a mistrial or, in the alternative, to have the jury specifically admonished that the prosecutor's comments on this topic were "improper" and that the jury should disregard them. Counsel also argued that "the jury is not to decide this case either on public passion or any concern for the consequences of the decision, strictly on the facts." The trial court denied the motion for mistrial, explaining: "There is no reference to committing other crimes. The District Attorney is arguing the evidence and the effects of the evidence and the fact that the evidence is not perfect; and if it were, if this jury requires perfect evidence, then [p]eople would be acquitted [in] every case that came in. I think that's a fair comment. As to the state of the evidence and whether it has to be perfect or just beyond a reasonable doubt[, the court will define those terms in the instructions]." The court further explained: "I do not find that the statements were misconduct. I did admonish the jury that they will decide the case on the evidence. I think that's sufficient."

Defendant claims five separate errors arose from the portion of the prosecutor's argument quoted above. He claims the prosecutor improperly: (i) argued defendant would pose a danger in the future; (ii) appealed to the passions and sympathy of the jury; (iii) invited the jury to rely on speculative matters; (iv) implied he knew facts not in evidence; and (v) commented on defendant's failure to testify, in violation of *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*).

■ To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673] [criminal defendant may not complain on appeal of prosecutorial misconduct unless he objected "on the same ground" at trial].) As we explained in the analogous situation of a civil case in which it was alleged that one attorney made prejudicial comments in closing argument: "The purpose of the rule requiring the making of timely objections is remedial in nature, and seeks to give the court the opportunity to admonish the jury, instruct counsel and forestall the accumulation of prejudice by repeating improprieties, thus avoiding the necessity of a retrial. . . . In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice." (*Horn v. Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561].) Failure to make a specific and timely objection and request that the jury be admonished forfeits the issue for appeal unless such an objection would have been futile. (*Hill, supra*, at p. 820.)

(i) Defendant first contends the prosecutor committed misconduct by urging the jury to consider his future dangerousness. This claim was unquestionably preserved because defense counsel complained of Pacheco's comment that an acquittal would lead to defendant "being out in the street with the jury." However, we agree with the trial court that there was no misconduct. The prosecutor reasonably relied on *People v. Hughey, supra*, 194 Cal.App.3d 1383, in which the Court of Appeal, in rejecting the defendant's claim of prosecutorial misconduct, stated that "[s]uggesting that a defendant will commit a criminal act in the future is not an inappropriate comment when there is sufficient evidence in the record to support the statement." (*Id.* at p. 1396.) In light of the unprovoked and vicious attack defendant perpetrated, there was sufficient evidence to support the prosecutor's argument.

Moreover, even were the comment improper, it could not have prejudiced defendant. "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer'

that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye, supra,* 18 Cal.4th at p. 970.) In this case, the remarks were brief and fleeting, asserting nothing the evidence did not already suggest: defendant posed a danger to people in the community. Any misconduct was thus harmless.

(ii) Defense counsel made but passing mention of defendant's second claim, that the prosecutor improperly appealed to the jurors' passions and sympathy. Assuming this ground was preserved for appeal, we find no misconduct. The prosecutor's argument, while forceful, did not clearly appeal to the jurors' passions and prejudices.

(iii) & (iv) Defense counsel nowhere mentioned that one basis of their objection to the prosecutor's argument was that it encouraged the jury to rely on speculative matters or implied knowledge of information not presented to the jury. Accordingly, these two claims were not preserved for appeal. Even were we to conclude these issues were properly preserved, they are baseless. █ We often have explained that a prosecutor may engage in vigorous argument before the jury, drawing reasonable deductions from the evidence. (*People v. Hill, supra,* 17 Cal.4th at p. 819.) The prosecutor here did no more than this.

(v) Defense counsel similarly failed to preserve a claim of *Griffin* error by objecting on that basis at trial. Even assuming the issue was preserved, however, there was no error. █ *Griffin, supra,* 380 U.S. 609, protects a defendant's right not to have the prosecutor comment on his failure to testify. A prosecutor is permitted, however, to comment on a defendant's failure to introduce material evidence or call logical witnesses. (*People v. Hughes* (2002) 27 Cal.4th 287, 372 [116 Cal.Rptr.2d 401, 39 P.3d 432].) By directing the jury's attention to the fact defendant never presented evidence that he was somewhere else when the crime was committed, the prosecutor did no more than emphasize defendant's failure to present material evidence. He did not capitalize on the fact defendant failed to testify. Accordingly, there was no *Griffin* error.

> 8. *Failure to Instruct the Jury That Fields Was an Accomplice as a Matter of Law*

Defendant next contends the trial court violated his state and federal constitutional rights to a fair trial, to a reliable penalty determination, and to due process of law by failing to grant his request[13] to instruct the jury that

---

[13] Although respondent characterizes this issue as whether the trial court failed to instruct the jury sua sponte that Fields was an accomplice, defendant clearly requested the instruction.

Broderick Fields was an accomplice as a matter of law. We disagree; further, we find that if error occurred, it was harmless.

"An accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) If sufficient evidence is presented at trial to justify the conclusion that a witness is an accomplice, the trial court must so instruct the jury, even in the absence of a request. (*People v. Tobias* (2001) 25 Cal.4th 327, 331 [106 Cal.Rptr.2d 80, 21 P.3d 758].) ▇▇ Of course, an accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts; accordingly, the law requires an accomplice's testimony be viewed with caution to the extent it incriminates others. (*People v. Lawley* (2002) 27 Cal.4th 102, 161 [115 Cal.Rptr.2d 614, 38 P.3d 461]; see generally *People v. Guiuan* (1998) 18 Cal.4th 558 [76 Cal.Rptr.2d 239, 957 P.2d 928]; CALJIC. No. 3.18.) Moreover, an accomplice's testimony must be corroborated before a jury may consider it. (§ 1111.)

Although the evidence of Fields's statements to Esquivel was not, strictly speaking, testimony before the jury, it was still subject to section 1111's corroboration requirement. "Testimony," as used in section 1111, includes " 'all out-of-court statements of accomplices . . . *used as substantive evidence of guilt* which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police.' " (*People v. Williams, supra,* 16 Cal.4th at p. 245, italics added.) At first blush, because Fields was subject to prosecution for the same criminal offenses as defendant, one might conclude he was an accomplice.

Respondent argues, however, that Fields's out-of-court statements were not " 'used as substantive evidence of guilt.' " (*People v. Williams, supra,* 16 Cal.4th at p. 245; see also *People v. Andrews* (1989) 49 Cal.3d 200, 214 [260 Cal.Rptr. 583, 776 P.2d 285] ["Section 1111 applies to an accomplice's out-of-court statements when such statements are *used as substantive evidence of guilt*" (italics added)].) Because Fields's statements were not used to incriminate defendant but to impeach defense witness Juan Williams, respondent argues, the trial court was not obligated to instruct the jury that Fields was an accomplice as a matter of law.

We need not resolve this point because we conclude the trial court was correct for another reason. Recall that Fields's statements were properly found to be declarations against penal interest. "The usual problem with accomplice testimony—that it is consciously self-interested and calculated—is not present in an out-of-court statement that is *itself sufficiently reliable* to be allowed in evidence." (*People v. Sully* (1991) 53 Cal.3d 1195,

1230 [283 Cal.Rptr. 144, 812 P.2d 163], italics added.) For example, we have explained that out-of-court statements made in the course of and in furtherance of a conspiracy "were not made under suspect circumstances and therefore were sufficiently reliable to require no corroboration." (*People v. Williams* (1997) 16 Cal.4th 635, 682 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Fields's statements to Esquivel were themselves made under conditions sufficiently trustworthy to permit their admission into evidence despite the hearsay rule; namely, they were declarations against his penal interest. Therefore, no corroboration was necessary, and the court was not required to instruct the jury to view Fields's statements with caution and to require corroboration.

Even were we to assume the trial court erred by refusing to instruct the jury that Fields was an accomplice, any error was manifestly harmless. "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record. [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]' . . . The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 370 [110 Cal.Rptr.2d 272, 28 P.3d 34].) Fields's statements were amply corroborated by testimony from other eyewitnesses to the crime, as well as witnesses who testified to defendant's own statements that he "smoked that bitch" and took her truck.

### 9. Jury Instructions Regarding P. M.

#### a. CALJIC No. 3.19

Defendant contends the trial court violated his state and federal constitutional rights to a fair trial, to a reliable penalty determination, and to due process of law by failing to grant his request to instruct the jury that P. M. was an accomplice as a matter of law. (See CALJIC No. 3.16.) Instead, the trial court decided the jury should determine the issue and instructed it thusly: "You must determine whether the witness [P. M.] was an [ac]complice as I have defined that term. [¶] The defendant has the burden of proving by a preponderance of the evidence that [P. M.] was an accomplice in the crimes charged against the defendant." (See CALJIC No. 3.19.) Defendant contends the trial court erred because there was ample evidence showing P. M. was subject to prosecution for the same crimes as defendant.

We disagree. "Whether a person is an accomplice within the meaning of section 1111 presents a factual question for the jury 'unless the evidence

permits only a single inference.' [Citation.] Thus, a court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are 'clear and undisputed.' " (*People v. Williams, supra,* 16 Cal.4th at p. 679.)

The evidence in this case did not permit the "clear and undisputed" inference that P. M. was an accomplice. P. M. testified that when he got in the car with defendant and Mark Bender, he did not know they intended to steal someone's wheel rims. He testified he found out about the plan once he was in the backseat of the car, but did not agree to it. The jury was certainly free to disbelieve this testimony, but it was sufficient evidence to support the trial court's decision that the witness was not an accomplice as a matter of law. Accordingly, we find the trial court did not err in refusing to give CALJIC No. 3.16.

Even were we to assume the trial court erred, we would find no prejudice. As we explained, *ante,* at part II.A.8., failure to instruct on accomplice liability under section 1111 is harmless if there was adequate corroboration of the witness. Here, the testimony from other eyewitnesses, as well as that from witnesses who testified to defendant's own statements that he "smoked that bitch" and took her truck, provides sufficient corroborative evidence to render any instructional error harmless.

### b. *CALJIC No. 3.10*

In a related claim, defendant also contends the trial court violated his state and federal constitutional rights to a fair trial, to a reliable penalty determination, and to due process of law by modifying the language of CALJIC No. 3.10. Thus, the court instructed the jury: "An accomplice is a person who is subject to prosecution for the identical offense charged in Counts I [the robbery of Christina Ramirez] *and* II [the murder of Ramirez] of the Information against the defendant on trial by reason of aiding and abetting." (Italics added.) As noted, *ante,* at part II.A.9.a., the court also instructed the jury that it was to determine whether P. M. was an accomplice, and that defendant bore the burden of proof on that question by a preponderance of the evidence. Defendant contends that, by wording the instruction in the conjunctive ("and") rather than the disjunctive ("or"), the trial court unfairly increased his burden of establishing the witness was an accomplice subject to the corroboration rule because it required him to prove P. M. was an accomplice for *both* the robbery *and* the murder.[14]

We disagree. Defendant's argument hinges on the possibility that the jury may have found P. M. was "subject to prosecution for" only one of the two

---

[14] Defendant also claims this alleged error was exacerbated by the court's failure to instruct sua sponte with CALJIC Nos. 3.02 and 3.00. We address this claim, *post,* at part II.A.9.c.

charged crimes, i.e., that P. M. was "subject to prosecution for" the robbery but not the murder, or for the murder but not the robbery. As there was absolutely no evidence suggesting he was guilty of the murder only, we may discard that possibility. But because he was in the car with Mark Bender, Broderick Fields and defendant when both crimes were committed, it is possible he was "subject to prosecution" for robbery if he acted "with (1) knowledge of the unlawful purpose of the perpetrator; . . . (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, [and] (3) by act or advice aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].) It is not possible, however, for P. M. to have been "subject to prosecution" for only the robbery and not the murder, for the victim's death, even if unintentional or accidental, would constitute first degree felony murder under these circumstances. (*People v. Pulido* (1997) 15 Cal.4th 713 [63 Cal.Rptr.2d 625, 936 P.2d 1235]; see § 189.) Hence, if P. M. was subject to prosecution for robbery, he necessarily was also subject to prosecution for murder. Thus, the court did not err by phrasing the instruction in the conjunctive.

Even were we to assume the trial court erred, defendant suffered no prejudice. The alleged harm in phrasing CALJIC No. 3.10 in the conjunctive was that the jury may erroneously have believed P. M. was not an accomplice to the murder, and that his testimony therefore need not be corroborated. As explained, *ante*, at part II.A.4., ample evidence corroborated P. M.'s testimony, including defendant's admission to more than one person that he "smoked that bitch," defendant's possession of the victim's truck, and Rena Stanfill's eyewitness account of the crime. Any error was thus harmless.

### c. *CALJIC Nos. 8.27, 3.00, 3.02*

In a related claim, defendant also contends the trial court violated his state and federal constitutional rights to a fair trial, to a reliable penalty determination, and to due process of law by denying his request to instruct the jury with CALJIC No. 8.27. Defendant further claims the alleged error in giving CALJIC No. 3.10 in the conjunctive was exacerbated by the court's failure to instruct sua sponte on aiding and abetting, specifically with CALJIC Nos. 3.02 and 3.00. We disagree.

CALJIC No. 8.27, as defendant proposed, provides: "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of [robbery], all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the

offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental." It does not appear defendant specifically asked the trial court to give CALJIC Nos. 3.00 or 3.02. They are, of course, the standard aider and abettor instructions.[15]

"A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. [Citations.]" (*People v. Ervin* (2000) 22 Cal.4th 48, 90 [91 Cal.Rptr.2d 623, 990 P.2d 506].) Of course, there was no suggestion that *defendant* was a mere aider and abettor; it was the prosecution's theory—and the evidence showed—that defendant was the one who personally fired the gun, killing the victim. Moreover, P. M. had been granted immunity and was not on trial. It would thus appear aiding and abetting instructions were unnecessary.

Despite these facts, defendant contends these three instructions were necessary to allow the jury properly to consider P. M.'s testimony. In particular, defendant argues there was substantial evidence from which the jury could find P. M. was an aider and abettor and thus an accomplice whose testimony required corroboration before it could be considered. This argument, then, is merely a variant of the claim that P. M. was an accomplice as a matter of law. Inasmuch as the trial court instructed the jury with CALJIC No. 3.19, which allowed the jury to find P. M. an accomplice subject to the corroboration requirement, the court did not err in refusing to give CALJIC No. 8.27 or failing to give CALJIC Nos. 3.00 or 3.02 sua sponte. "[T]he general rule is that a trial court may refuse a proffered instruction if it . . . is duplicative." (*People v. Gurule, supra,* 28 Cal.4th at p. 659.) As explained, *ante,* at part II.A.4., even were we to assume that the failure to instruct

---

[15] CALJIC No. 3.00 provides: "Persons who are involved in [committing] [or] [attempting to commit] a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: [¶] 1. Those who directly and actively [commit] [or] [attempt to commit] the act constituting the crime, or [¶] 2. Those who aid and abet the [commission] [or] [attempted commission] of the crime."

CALJIC No. 3.02 provides: "One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [that crime] [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted.

"In order to find the defendant guilty of the crime[s] of _____, [as charged in Count[s] _____,] you must be satisfied beyond a reasonable doubt that:

"1. The crime [or crimes] of _____ [was] [were] committed;

"2. That the defendant aided and abetted [that] [those] crime[s];

"3. That a co-principal in that crime committed the crime[s] of _____; and

"4. The crime[s] of _____ [was] [were] a natural and probable consequence of the commission of the crime[s] of _____ ."

interfered with defendant's ability to have the jury conclude P. M. was an accomplice, any error was harmless because P. M.'s testimony was amply corroborated.

> 10. *Instruction with CALJIC No. 2.11.5 Concerning Unjoined Perpetrators*

Defendant's next claim of error concerns CALJIC No. 2.11.5. The trial court delivered that instruction as follows: "There has been evidence in this case indicating that a person or persons other than the defendant was or may have been involved in the crime or crimes for which the defendant is on trial. [¶] Do not discuss or give any consideration to why the other person or persons are not being prosecuted in this trial or whether he has been or will be prosecuted." Defendant contends this instruction improperly removed from the jury's consideration the potentially impeaching fact that P. M. had been granted immunity. In addition, he argues the instruction precluded consideration of the fact that Mark Bender and Broderick Fields were potential accomplices subject to prosecution. Defendant claims the instruction, by eliminating potential grounds of bias and motive that could have undermined the testimony of those three witnesses,[16] violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous state constitutional provisions.

At the outset, we note it appears defense counsel made a tactical decision specifically to withdraw their objection to the instruction. Accordingly, the doctrine of invited error bars consideration of this claim on appeal. (*People v. Lewis* (2001) 25 Cal.4th 610, 667 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Assuming the issue was preserved for appellate review, it is meritless.

We have addressed and rejected this precise claim in other cases. "The purpose of [CALJIC No. 2.11.5] is to discourage the jury from irrelevant speculation about the prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the perpetration of the charged offenses, and also to discourage speculation about the eventual fates of unjoined perpetrators. [Citation.] When the instruction is given with the full panoply of witness credibility and accomplice instructions, as it was in this case, [jurors] will understand that although the separate prosecution or nonprosecution of coparticipants, and the reasons therefor, may not be considered on the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be considered as evidence of interest or bias in assessing the credibility of prosecution witnesses. [Citation.] Although the

---

[16] Mark Bender's testimony was admitted as a spontaneous utterance. Fields's statements were made out of court, but were admitted as declarations against penal interest to impeach the testimony of defense witness Juan Williams.

instruction should have been clarified or omitted [citations], we cannot agree that giving it amounted to error in this case." (*People v. Price, supra,* 1 Cal.4th at p. 446; see also *People v. Cain* (1995) 10 Cal.4th 1, 35 [40 Cal.Rptr.2d 481, 892 P.2d 1224], quoting *Price* with approval.)

Here, the jury was instructed that, "[i]n determining the believability of a witness, you may consider anything that has a tendency [in] reason to prove or disprove the truthfulness of the testimony of the witness, including but not limited to . . . . The existence or nonexistence or a bias[,] interest or other motive." (See CALJIC No. 2.20.) The jury was also instructed not to "single out any particular sentence or individual point or instruction and ignore the others. Consider the instructions as a whole and each in light of all the others." (See CALJIC No. 1.01.) Finally, the jury was specifically instructed that Mark Bender was an accomplice as a matter of law. In light of these instructions, we conclude that although the instruction challenged here could have been clearer, the trial court did not err in giving it, and there was no reasonable likelihood the jury understood CALJIC No. 2.11.5 to preclude its consideration of P. M.'s grant of immunity, or the potential accomplice status of Mark Bender and Broderick Fields. (See *People v. Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

11. *Instruction with CALJIC No. 2.01 Concerning Circumstantial Evidence*

Defendant next contends the trial court violated his state and federal constitutional rights to a reliable guilt and penalty verdict and to due process of law by denying his request to have the jury instructed with CALJIC No. 2.01. That instruction provides in pertinent part: "[A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion."[17] The trial court did not err.

---

[17] CALJIC No. 2.01 provides in full: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

"Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence [as to any particular count] permits two reasonable interpretations, one of which points to the defendant's guilt and the other to [his] [her] innocence, you must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to [his] [her] guilt.

"[W]e have consistently held that CALJIC No. 2.01 is not necessary unless the prosecution substantially relies on circumstantial evidence to prove its case. [Citations.] Indeed, where circumstantial inference is not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct, the instruction may confuse and mislead, and thus should not be given." (*People v. Anderson* (2001) 25 Cal.4th 543, 582 [106 Cal.Rptr.2d 575, 22 P.3d 347].) The Use Note following CALJIC No. 2.01 itself provides: "This instruction is unnecessary where the prosecution does not substantially rely on circumstantial evidence." (Use Note to CALJIC No. 2.01 (7th ed. 2003) p. 33.)

We agree with respondent that the People's case relied primarily on direct, not circumstantial, evidence. P. M. testified he saw defendant shoot the victim and steal her truck. Rena Stanfill saw essentially the same thing, although she did not hear the gunshot because her windows were rolled up and her radio was playing. Mark Bender, an eyewitness and probable accomplice, told his brother and sister-in-law that defendant "hurt" the victim. Defendant told Andrew White in front of the liquor store that he "smoked that bitch." Both Perry Bender and Julie Bender testified to the same thing. Although there were circumstantial aspects to the People's evidence, as defendant details in his brief, the primary emphasis of the prosecution's case was direct evidence. Accordingly, the trial court did not err in refusing to instruct the jury with CALJIC No. 2.01.

### B. Penalty Phase Issues

#### 1. Refusal to Permit Evidence of the Sentences of Other Perpetrators

Defendant requested that the trial court take judicial notice of the sentences meted out to Mark Bender and Broderick Fields, claiming this information was mitigating evidence. The trial court denied the motion, and defendant now contends this was error. He admits we have rejected this legal claim several times in the past (see, e.g., *People v. Hines* (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388]), but urges us to reconsider, relying on *Parker v. Dugger* (1991) 498 U.S. 308 [112 L.Ed.2d 812, 111 S.Ct. 731].

"We have consistently held that evidence of an accomplice's sentence is irrelevant at the penalty phase because 'it does not shed any light on the circumstances of the offense or the defendant's character, background, history or mental condition.' " (*People v. McDermott* (2002) 28 Cal.4th 946,

---

"If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

1004–1005 [123 Cal.Rptr.2d 654, 51 P.3d 874], quoting *People v. Cain, supra,* 10 Cal.4th at p. 63.) Defendant presents no persuasive reason to reconsider that conclusion. *Parker v. Dugger, supra,* 498 U.S. 308, on which he relies, does not direct a different result. "*Parker* did not hold evidence of an accomplice's sentence must be introduced in mitigation at the penalty phase, or that a comparison between sentences given codefendants is required. [Citation.] The *Parker* court merely concluded a Florida trial judge, in sentencing the defendant to death, had in fact considered the nonstatutory mitigating evidence of the accomplice's sentence, as under Florida law he was entitled to do. [Citation.] *Parker* does not state or imply the Florida rule is constitutionally required, and California law is to the contrary; we have held such evidence irrelevant because it does not shed any light on the circumstances of the offense or the defendant's character, background, history or mental condition." (*Cain, supra,* at p. 63.) We conclude the trial court did not err in refusing to grant the request for judicial notice.

Defendant next raises several claims concerning the jury instructions at the penalty phase.

### 2. *Failure to Instruct the Jury with CALJIC No. 2.01 Concerning Circumstantial Evidence*

As he did for the guilt phase, defendant contends the trial court violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution by refusing to instruct the jury at the penalty phase with CALJIC No. 2.01.[18] As explained, *ante,* at part II.A.11., CALJIC No. 2.01 is required only where the prosecution substantially relies on circumstantial evidence. "[W]here circumstantial inference is not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct, the instruction may confuse and mislead, and thus should not be given." (*People v. Anderson, supra,* 25 Cal.4th at p. 582.)

Defendant claims the prosecution relied substantially on circumstantial evidence for the penalty phase, primarily to prove the existence of unadjudicated criminal conduct. We disagree. To prove the robbery of Danny Alcaraz and the assault on Monica R., the prosecution relied principally on the eyewitness testimony of P. M. The fact that Alcaraz's stolen car was found in an area near defendant's home, and that Andrew White saw defendant driving a car similar to the one he stole from Alcaraz, was circumstantial evidence, but the prosecution's primary evidence—P. M.'s eyewitness testimony—was direct, not circumstantial.

---

[18] Somewhat inexplicably, defendant does not state that he is also relying on his state constitutional rights for this issue.

The same is true for the other incidents of unadjudicated crimes. To prove the assault on Flecia Bennett, the prosecution relied principally on the victim's own eyewitness account. To prove the murder of Francisco Carillo, the prosecution relied principally on Kevin Davis's and Willie Woods's eyewitness testimony. To prove the robbery and attempted murder of Danny Coria, the prosecution principally relied on the victim's and Willie Woods's direct eyewitness testimony. To prove the attempted robbery of Sharon Baker, the prosecution relied on the victim's eyewitness testimony. Although the prosecution presented some circumstantial evidence, it was merely incidental to the direct evidence. Inasmuch as the prosecution relied substantially on direct evidence to prove these unadjudicated crimes, we conclude the trial court properly refused CALJIC No. 2.01 at the penalty phase.

### 3. *Failing to Instruct the Jury, and Prohibiting Defendant from Arguing, That a Minor Is Not Subject to the Death Penalty*

Defendant requested the following instruction: "An individual under 18 is not subject to the death penalty. You may consider the fact that Mr. Brown was 19 at the time of this offense." The trial court refused the instruction, noting, "I think that's an improper instruction for the jury, to tell them that somebody under 18 isn't subject [to the death penalty]. Again[, it] invites them to start speculating why . . . the Legislature has made this classification. That's not an issue for the jury." The court also noted the subject was adequately covered in CALJIC No. 8.85, factor (i).

Defendant contends the trial court's refusal to give his requested age-related instruction violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous state constitutional provisions.[19] We disagree and instead find the trial court correctly refused the proffered instruction. "[T]he general rule is that a trial court may refuse a proffered instruction if it . . . is argumentative, or is duplicative." (*People v. Gurule, supra,* 28 Cal.4th at p. 659.) "Although instructions pinpointing the theory of the defense might be appropriate, a defendant is not entitled to instructions that simply recite facts favorable to him." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1159 [124 Cal.Rptr.2d 373, 52 P.3d 572].) By instructing the jury that those younger than 18 years old are legally ineligible for the death penalty, the proffered

---

[19] Defendant notes a similar instruction was delivered to the jury in *People v. Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676]. In *Marshall,* the jury was instructed: "[The defendant] was 18 years old when he committed the crimes of which you have found him guilty. [¶] If defendant had been under 18 years old when the crimes were committed, he would be subject to neither life imprisonment without possibility of parole nor the death penalty." (*Id.* at p. 930.) We neither approved nor disapproved this instruction in *Marshall.*

instruction highlighted a single, mitigating aspect of defendant's age—that he had only recently become eligible for the ultimate penalty—and was thus improperly argumentative.

In a related claim, defendant argues the trial court improperly prohibited him from mentioning in closing argument that those younger than 18 years old are ineligible for the death penalty. We perceive no error. Counsel were free to argue that defendant's youth mitigated his crime and in fact mentioned this fact obliquely, discussing defendant's troubled adolescence. The further information that the Legislature has chosen 18 years as the lower limit for the death penalty was irrelevant to defendant's individual culpability or whether he was more or less deserving of the death penalty. (*People v. Garceau* (1993) 6 Cal.4th 140, 206 [24 Cal.Rptr.2d 664, 862 P.2d 664] [assuming, without deciding, that mentioning irrelevant information in closing argument is improper].) Accordingly, the trial court did not err in precluding defense counsel from mentioning that fact.

### 4. *Failure to Instruct the Jury That the Circumstances of the Crime Can Be Either Aggravating or Mitigating*

Defendant next argues the trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous state constitutional guarantees, by refusing this proffered instruction: "The circumstances of a crime can be considered mitigating or aggravating. You are not authorized to consider the bare fact that Mr. Brown has suffered a murder conviction as aggravating, but instead are required to consider the circumstances surrounding it." We find no error. The court instructed the jury with CALJIC No. 8.85, specifically telling it: "In determining which penalty is to be imposed upon the defendant you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable: [¶] First, the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true." In addition, the court instructed the jury with CALJIC No. 8.88, defining the terms "aggravating" and "mitigating."[20] The jury was thus provided sufficient guidance as to how it should evaluate and weigh the circumstances of the offense. The first sentence of the proposed instruction

---

[20] CALJIC No. 8.88 provides: "An aggravating factor is any fact, condition or event attending the commission of a crime which increases [its] guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. [¶] A mitigating circumstance is any fact, condition or event which as such does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty."

was duplicative of these standard instructions (*People v. Gurule, supra,* 28 Cal.4th at p. 659); the second sentence, prohibiting the jury from assigning aggravating effect to the circumstances of the offense without first considering the "circumstances surrounding it," was argumentative and also properly refused (*ibid.*).

### 5. Failure to Instruct the Jury That It Should Not Consider Deterrence or the Cost of the Death Penalty

Defendant next argues the trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous state constitutional guarantees, by refusing this proffered instruction: "Your perception of the general deterrent effect, and your perception of the cost of the decision you reach, are improper for you to consider. You are specifically instructed to ignore any comments made on these topics." He cites *People v. Thompson* (1988) 45 Cal.3d 86, 132 [246 Cal.Rptr. 245, 753 P.2d 37], as authority for the proposition that the court would not have erred had it given this instruction. Because neither party raised the issue of either the cost or the deterrent effect of the death penalty, the trial court did not err in refusing the proposed instruction. (*People v. Hines, supra,* 15 Cal.4th at pp. 1066–1067.) "We have held a trial court may refuse to read this instruction where neither deterrence nor cost is raised by the parties. (*People v. Benson* (1990) 52 Cal.3d 754, 806–807 [276 Cal.Rptr. 827, 802 P.2d 330].) Moreover, so long as these issues are not raised, there can be no prejudice from the instruction's omission." (*People v. Ochoa* (2001) 26 Cal.4th 398, 456 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

Defendant argues the jury "could well have erroneously concluded that it would have been more economical to sentence him to death than keep him in prison for the next approximate[ly] 50 years." Such speculation, however, provides no basis for the proposed instruction. Although defendant contends the prosecutor raised the issue in closing argument, we disagree. The prosecutor argued: "Ladies and gentlemen, don't let the price of your compassion be another victim. If you give him life without parole, you could create another victim." This was not an argument based on the cost of the death penalty, but instead invoked defendant's future dangerousness. The same is true for the prosecutor's argument in rebuttal that "[w]e can't put him in the prison system until he passes away at 65 or 55 and give him 30, 40 years of an opportunity to kill a guard or kill a doctor or kill someone else." We thus find no error.

### 6. *Failure to Instruct the Jury That the Responsibility for Deciding the Penalty Rested Solely With the Jury*

Defendant next argues the trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous state constitutional guarantees, by refusing this proffered instruction: "The responsibility for determining if life without the possibility of parole or the death penalty is an appropriate sentence for Mr. Brown rests solely with this jury, based solely on the evidence presented in this trial." This instruction was largely duplicative of CALJIC No. 8.88, which informed the jury that "[I]t is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed upon the defendant." As such, it was properly refused. (*People v. Gurule, supra,* 28 Cal.4th at p. 659.) Because counsel's closing arguments made no suggestion that the responsibility for the sentencing decision lay elsewhere (see *Caldwell v. Mississippi* (1985) 472 U.S. 320, 328–329 [86 L.Ed.2d 231, 105 S.Ct. 2633] ["constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"]), any error was harmless.

### 7. *Failure to Instruct the Jury on Lingering Doubt*

Defendant next argues the trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous state constitutional guarantees, by refusing two proposed instructions addressing the issue of lingering doubt. The first rejected instruction stated: "The adjudication of guilt is not infallible and any lingering doubts you may entertain on the question of guilt may be considered by you in determining the appropriate penalty, including the possibility that at some time in the future, facts may come to light which have not yet been discovered." The second rejected instruction was similar, though shorter: "[The jury should consider] whether or not you have lingering or residual doubt as to whether Andrew Brown shot Christina Ramirez."

"[A]lthough it is proper for the jury to consider lingering doubt, there is no requirement that the court specifically instruct the jury that it may do so." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1219 [120 Cal.Rptr.2d 477, 47 P.3d 262].) The rule is the same under the state and federal Constitutions. (*Franklin v. Lynaugh* (1988) 487 U.S. 164, 173–174 [101 L.Ed.2d 155, 108 S.Ct. 2320]; *People v. Lawley, supra,* 27 Cal.4th at p. 166.) Moreover, although defendant contends the proposed instructions "would have merely given the jury the opportunity to consider any lingering doubt they may have had concerning the . . . murder," the instructions given already permitted such

an opportunity. Thus, the proposed lingering doubt instructions were subsumed by the instruction based on section 190.3, factor (k), which informed the jury to "consider" and "take into account" "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other sympathetic or other aspect of the defendant's character or record."

Defendant argues the first proposed lingering doubt instruction was also necessary to permit the jury's proper consideration of penalty phase evidence showing he had committed several unadjudicated criminal acts, allowing it to disregard such evidence if it harbored a lingering doubt as to his guilt of those crimes. We agree with respondent that the instruction was unnecessary because the court instructed the jury not to consider evidence of other criminal acts unless defendant's guilt was proved beyond a reasonable doubt.[21]

Defendant also contends a lingering doubt instruction was necessary because two jurors who deliberated at the penalty phase had not been a part of the jury that found defendant guilty in the guilt phase of trial.[22] Thus, he argues: "These two former alternate jurors were thus never given the authority to reject imposition of the death penalty on the basis of any evidence relevant to the circumstances of the crime [defendant] had been convicted of in the guilt phase of the trial . . . ." This claim is belied by the section 190.3, factor (k) instruction, which permitted the new jurors, as well as the existing ones, to consider any lingering doubts the jurors might have had and to reject the death penalty in favor of a life sentence. Accordingly, we conclude the trial court did not err in refusing the two proposed lingering doubt instructions.

### 8. *Rejection of Pinpoint Instructions*

Defendant contends the trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as to analogous state constitutional provisions, by erroneously rejecting a series of proposed pinpoint penalty phase instructions. They read:

"You may consider any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any

---

[21] Thus, the jury was instructed: "Before a juror may consider any of such criminal acts or activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant, Andrew Lamont Brown, did in fact commit such criminal act or activity. You may not consider any evidence of any other criminal acts or activity as an aggravating circumstance." (See CALJIC No. 8.87.)

[22] Between the guilt and penalty phases of the trial, Juror Victoria H. was replaced by Alternate Juror Robin R. due to medical reasons, and Juror Cheryl K. was replaced by Alternate Juror Herbert S. due to a death in her family.

sympathetic or other aspect of Mr. Brown's character or record that he offers as a basis for a sentence less than death, whether or not related to the offense for which he is [on] trial. These include, but are not limited to: . . .

"Whether or not Mr. Brown was properly treated for any physical cruelty or abuse you feel he suffered, or medical condition he had, and the effect of any lack of care on his development.

"Whether or not Mr. Brown's educational needs were neglected by the schools he attended.

"Whether or not Mr. Brown has borderline intelligence.

"Whether or not Mr. Brown was raised in a violent, and negative community environment, and the effect of that environment on him.

"Whether or not Mr. Brown was exposed to violence in his household as an infant and a child and the effect of this upon him.

"Evidence of neglect or abuse in a defendant's background are relevant in our law because of a long-held belief in our society that people who commit criminal acts that are attributable to a disadvantaged background, or who suffered neglect, abuse, or mental limitation, may be less morally culpable than those who have not.

"Mercy, or compassion you feel based on the evidence is appropriate for you to consider in deciding whether to sentence Mr. Brown to death."

We find no error. "We previously have explained that the standard CALJIC penalty phase instructions 'are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards.' [Citation.] Moreover, the general rule is that a trial court may refuse a proffered instruction if it is an incorrect statement of law, is argumentative, or is duplicative." (*People v. Gurule, supra,* 28 Cal.4th at p. 659.) The jury was instructed with CALJIC No. 8.85, which explains the various aggravating and mitigating factors. In particular, it was instructed with section 190.3, factor (k), which is essentially duplicated by the first paragraph of the rejected instruction.[23] The trial court thus did not err in refusing this proposed instruction, and we reject defendant's contention that his proposed instruction

---

[23] Thus, the jury was instructed: "You shall consider, take into account and be guided by the following factors, if applicable . . . twelfth, any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record such as physical abuse or cruelty suffered during his formative years that the defendant offers as a base—basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any

should have been repeated for the jury as a preface to the other rejected instructions. (*Gurule, supra,* at p. 659 [court need not give duplicative instructions].)

Defendant also claims the court should have instructed the jury to consider any "physical cruelty or abuse he suffered, or medical condition he had." The court essentially gave this instruction, informing the jury that it could consider "physical abuse or cruelty suffered [by defendant] during his formative years." (See, *ante,* fn. 23.) This instruction was also duplicative. (*People v. Gurule, supra,* 28 Cal.4th at p. 659.)

Many of the other instructions the trial court rejected (concerning lack of medical care, educational neglect, borderline intelligence, violent childhood community and household, neglect and abuse) attempted to highlight selected portions of the evidence and were thus properly rejected as argumentative. " '[A] court may properly refuse an instruction that is argumentative' [citation] or that 'single[s] out only a partial list of potential mitigating factors for the jury's consideration.' " (*People v. Cox* (1991) 53 Cal.3d 618, 678, fn. 21 [280 Cal.Rptr. 692, 809 P.2d 351].)

Although the final proposed instruction concerning mercy and compassion was not argumentative, we nevertheless find the trial court did not err in refusing it. As defendant himself admits, we have held that " 'a jury told it may sympathetically consider all mitigating evidence need not also be expressly instructed it may exercise mercy.' [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 344 [75 Cal.Rptr. 2d 412, 956 P.2d 374].) Because defendant's jury had been instructed in the language of section 190.3, factor (k), we must assume the jury already understood it could consider mercy and compassion; accordingly, the trial court did not err in refusing the proposed mercy instruction.

### 9. *Consideration of Unadjudicated Criminal Conduct*

Defendant contends the trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous provisions of the California Constitution, by permitting the jury to consider unadjudicated criminal conduct as aggravating factors. This argument is, in fact, a facial attack on the constitutionality of section 190.3, factor (b), which provides: "In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the

jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principal [*sic*]."

use or attempted use of force or violence or the express or implied threat to use force or violence." As defendant admits, we long ago rejected this argument. Thus, in *People v. Balderas* (1985) 41 Cal.3d 144, 205 [222 Cal.Rptr. 184, 711 P.2d 480], we stated: "we must also reject defendant's argument that other crimes are inadmissible per se in a penalty trial. Contrary to defendant's suggestion, admission of evidence of uncharged criminal violence does not impose the death penalty for a noncapital offense of which defendant was never convicted. Rather, the evidence of criminality, if proved beyond a reasonable doubt ([*People v. Robertson* (1982) 33 Cal.3d 21,] 53–55 [188 Cal.Rptr. 77, 655 P.2d 279]), is simply one factor the penalty jury is to consider in deciding the appropriate punishment for the capital offense." Although defendant urges this court to reconsider *Balderas*, he provides no persuasive reason to do so. As we recently held, "[w]e repeatedly have rejected claims, identical to that made by defendant, that criminal activity occurring subsequent to the commission of the charged offense is inadmissible under section 190.3, factor (b)." (*People v. Hart* (1999) 20 Cal.4th 546, 648–649 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

Defendant argues the trial court compounded the alleged error by failing to instruct the jury on the elements of these other crimes. He asks: "How could the jury determine that defendant was guilty of the uncharged offenses and consider them in aggravation if the trial judge fails to provide them with the proper tools and guidance to make such a finding?" There was no error. As we have explained: "[A] criminal defendant may have tactical reasons to forgo lengthy instructions on the elements of alleged other crimes. [Citation.] We fail to see how forcing a capital defendant to forgo this tactical option vindicates his federal constitutional rights. As we made clear in *Phillips* . . . if a defendant requests an instruction explaining the elements of the other crimes at issue, he is entitled to have the jury so instructed." (*People v. Hardy*, *supra*, 2 Cal.4th at p. 207, citing *People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) Defendant did not request such instructions.

Finally, defendant complains that the trial court directed a verdict with respect to one of the instances of unadjudicated criminal conduct. Although its instructions to the jury regarding the unadjudicated crimes were all couched in terms of the "alleged" violations, the court described one of the alleged crimes as if it had already been found true. Thus, the court, in describing the various unadjudicated crimes, stated: "The incident occurring on or about November 5th, 1988, in which the defendant committed an assault with a firearm on Monica [R.] and Gloria [A.], a violation of Penal Code section 245(a)(2)." Defendant claims "this violated [his] right to have the jury decide the facts of the case and instead took the fact-finding function away from the jury in violation of [defendant's] Sixth Amendment rights."

Given that the trial court spoke of the other crimes by saying "the defendant *is alleged* to have committed" (italics added), it seems clear the court merely misspoke. Indeed, when describing the evidence of attempted robbery against Sharon Baker, the court stated: "The incident occurring on or about January 27, 1988, in which the defendant committed, *committed— excuse me, in which it is alleged the defendant committed.* . . ." (Italics added.) Reading the instructions as a whole, it seems extremely unlikely the jury believed it was required to determine beyond a reasonable doubt whether defendant committed the other crimes, but was to accept that defendant in fact committed an assault with a firearm on Monica R. and Gloria A. Any error was harmless.

### 10. *Failure to Instruct the Jury Following Substitution of Jurors at the Penalty Phase*

Before the start of the penalty phase of trial, Alternate Juror Robin R. replaced Juror Victoria H. due to medical reasons. Then, during the presentation of penalty phase evidence but before jury deliberations had begun, Alternate Juror Herbert S. replaced Juror Cheryl K. due to a death in her family. Defendant contends his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous provisions of the California Constitution, were violated by the trial court's failure to instruct the jury sua sponte that the jurors review together the guilt phase evidence in order to discuss any lingering doubt the two new jurors may have had.

We disagree. "The excusal of a juror for good cause and the substitution of an alternate at the penalty phase *prior to commencement of deliberations* do not require a retrial of the guilt phase or a reweighing of the evidence received at the earlier phase of the proceedings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1030 [108 Cal.Rptr.2d 291, 25 P.3d 519], italics added; *People v. Brown* (1988) 46 Cal.3d 432, 460–461 [250 Cal.Rptr. 604, 758 P.2d 1135].) Inasmuch as the two new jurors were substituted into the jury before deliberations, no such instruction was required. To the extent defendant contends the trial court erred by failing to instruct the jury sua sponte on lingering doubt as a result of the two new jurors, we reject that claim as well. (*Cunningham, supra,* at p. 1030.)

### 11. *Admission of Victim Impact Evidence*

Defendant contends his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous provisions of the California Constitution, were violated by the admission of evidence from the victim's mother, Susie Barraza, and the victim's mother-in-law, Maria Ramirez. We find no error. Admission of victim impact

evidence at the penalty phase of a capital trial is permissible under the Eighth Amendment (*Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597]), and we have several times ruled such evidence is admissible as a circumstance of the offense under section 190.3, factor (a) (see, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 443–444 [127 Cal.Rptr.2d 544, 58 P.3d 391]).

Defendant concedes that victim impact evidence generally is admissible, but contends the evidence the trial court admitted "far exceeded even permissible 'victim impact' evidence." First, he argues the evidence from Christina Ramirez's mother-in-law was not evidence from a "victim" or "even a filial relative." ██ We reject the suggestion that victim impact evidence in a capital trial is or should be limited to blood relatives.[24] The jury, in making a normative decision whether the defendant should live or die, is entitled to hear how the defendant's crime has harmed the survivors. (See *People v. Marks* (2003) 31 Cal.4th 197, 235–236.)

Defendant also contends the trial court did not limit the testimony to the immediate impact of defendant's robbery and murder of Christina Ramirez, but allowed both witnesses to testify they were still scared to go outside at night, more than three years after the crime. He claims this evidence "was unduly prejudicial and rendered the penalty phase trial fundamentally unfair." We perceive no unfairness. It is common sense that surviving families would suffer repercussions from a young woman's senseless and seemingly random murder long after the crime is over.

We similarly reject defendant's claims that such evidence is irrelevant and that the court did not instruct the jury how to consider it. On the contrary, victim impact evidence is relevant to section 190.3, factor (a) ("The circumstances of the crime of which the defendant was convicted in the present proceeding"), and the court instructed the jurors with CALJIC No. 8.85, which tells them to "consider, take into account and be guided by" such factors. Defendant further argues that permitting the jury to consider victim impact evidence under section 190.3, factor (a) renders the "circumstances of the crime" unconstitutionally vague and overbroad. Defendant failed to

[24] Defendant's sole legal authority for this claim is section 1191.1, which provides in pertinent part that "The victim, or up to two of the victim's parents or guardians if the victim is a minor, or the next of kin of the victim if the victim has died, have the right to appear, personally or by counsel, at the sentencing proceeding and to reasonably express his, her, or their views concerning the crime, the person responsible, and the need for restitution." It is doubtful this statute applies to the penalty phase of a capital trial, but in any event it has been held that a trial court has the discretionary power under section 1191.1 to hear witnesses who are not strictly victims. (*People v. Zikorus* (1983) 150 Cal.App.3d 324, 332 [197 Cal.Rptr. 509].)

preserve this claim for appellate review by making a timely and specific objection. In any event, we reject it. (*People v. Boyette, supra*, 29 Cal.4th at p. 445, fn. 12.)

### 12. The Prosecutor's Use of Inconsistent Theories

At Sunnymead Park in November 1987, four men robbed Danny Coria at gunpoint of his vehicle, a Suzuki Samurai. One of his assailants also shot him in the arm. He reported that an African-American male wearing a gray jogging suit pointed a gun at him and fired. Willie Woods was later found driving Coria's Suzuki, wearing a gray jogging suit. Coria identified Woods as the man who shot him, and Woods pleaded guilty to attempted murder in exchange for a 12-year sentence, which he was serving at the time of defendant's capital trial. At defendant's trial, Coria was no longer sure which of his assailants actually shot him. Woods testified he was with Broderick Fields, Torrey Bennett and defendant, but that it was defendant who actually shot Coria. Asked why he pleaded guilty although he was not the shooter, he explained that he knew none of the others would come forward because they were members of the same gang and that police could not find defendant.[25]

Defendant contends his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous provisions of the California Constitution, were violated by the prosecution's arguing inconsistent theories in Woods's and defendant's cases. As he did at trial,[26] he cites *Drake v. Kemp* (11th Cir. 1985) 762 F.2d 1449 in support. We need not resolve this issue because its premise—that the prosecutor argued inconsistent theories in the separate trials of coperpetrators—is flawed. The prosecutor did not obtain a conviction against Woods by arguing he was necessarily the man who personally shot Coria. Woods, who was offered a favorable plea bargain, pleaded guilty to shooting Coria. The matter thus never went to trial. At defendant's trial, Coria explained that he was then unsure which man, Woods or defendant, actually shot him. Woods himself explained for the jury the circumstances of the Coria shooting. Because the prosecution did not argue inconsistent theories, we reject defendant's claim that his constitutional rights were violated.

---

[25] Asked whether defendant, Fields and Bennett "somehow would stick together because of [a] relationship," Woods replied: "And they are, if they are all Bloods. I'm the only Crip in the bunch. I know for a fact that they won't get me. You know what I'm saying? Just take the 12 [years] and do my 12, be happy. I should have gotten some time. I was there. Do you know what I'm saying? Doing the time is not the problem. Do you know what I'm saying? I told [them]: 'Give me the time. I was there. I should get something.' You know. But, as far as the gunman, you can't find him, 'Hey, I take it, you know. Why not?' "

[26] Defendant moved in limine to exclude Coria's and Woods's evidence on the theory of inconsistent prosecutorial theories.

### 13. *Refusal to Permit Defendant to Introduce Evidence of the Living Conditions of a Life Prisoner*

Defendant moved to admit evidence of the security surrounding a life prisoner in prison in order to counter the prosecution's anticipated evidence concerning defendant's future dangerousness if sentenced to life in prison. The trial court denied the request, finding the evidence irrelevant. Defendant now contends his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous provisions of the California Constitution, were violated by this ruling. We disagree. "We have previously held that evidence of the conditions of confinement that a defendant will experience if sentenced to life imprisonment without parole is irrelevant to the jury's penalty determination because it does not relate to the defendant's character, culpability, or the circumstances of the offense." (*People v. Quartermain* (1997) 16 Cal.4th 600, 632 [66 Cal.Rptr.2d 609, 941 P.2d 788].) Defendant recognizes the weight of authority is against him, but urges this court to reconsider the issue. We find no persuasive reason to do so; defendant remained free to argue that aspects of his history or background supported the notion he would not be dangerous in the future, thereby answering the prosecution's argument to the contrary. "While defendant might have an interest in telling the jurors of . . . the rigors of confinement in order to impress upon them the gravity of their responsibility, that interest could be satisfied in his argument." (*People v. Daniels* (1991) 52 Cal.3d 815, 877–878 [277 Cal.Rptr. 122, 802 P.2d 906].)

### 14. *Refusal to Permit Defendant to Introduce Favorable Character Evidence*

After hearing from several witnesses who testified on defendant's behalf, defendant called his aunt, Mary McGowan, to the stand. When defense counsel asked her whether she had "feelings" about the decision between life and death regarding defendant, the prosecutor objected on the ground the proposed testimony was cumulative to that of previous witnesses. After a sidebar discussion, the trial court sustained the objection, specifically citing Evidence Code section 352. Defense counsel asked no further questions, but later renewed his request to ask the witness "about her feelings regarding the [life or death] decision." The prosecutor indicated he had a continuing objection, and the trial court indicated his previous ruling sustaining the objection would stand.

Defendant contends the trial court, by excluding McGowan's testimony as cumulative, violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous provisions of the California Constitution. He correctly argues that

the evidence was admissible (*People v. Ochoa* (1998) 19 Cal.4th 353, 456 [79 Cal.Rptr.2d 408, 966 P.2d 442] ["A defendant may offer evidence that he or she is loved by family members or others, and that these individuals want him or her to live]") and contends the evidence was not cumulative, as the trial court found. In particular, he observes that several defense witnesses testified to having warm and loving feelings towards defendant, but that none (save one) actually stated a preference between life and death. The one exception was defendant's mother, Catherine Williams, who testified she believed "staying [in prison] for life is just as bad as being put on death row or the death penalty."

 Evidence Code section 352 permits the exclusion of evidence on the ground that it is cumulative. A trial court's exclusion of evidence on this ground will not be reversed on appeal unless the court abused its discretion. (See *People v. Williams, supra,* 16 Cal.4th at p. 213.) We need not decide whether the trial court abused its discretion here, because the exclusion of McGowan's testimony, if error, was harmless in that it is not reasonably possible defendant would have obtained a different verdict but for the error. (See *People v. Ervin* (2000) 22 Cal.4th 48, 103 [91 Cal.Rptr.2d 623, 990 P.2d 506] [state law error at the penalty phase tested by the "reasonable possibility" test]; *People v. Brown, supra,* 46 Cal.3d at p. 448 [same].) Here, the jurors could readily have inferred from previous defense witnesses that they preferred defendant be spared the death penalty. For example, defendant's aunt, Louise Matthews, was asked: "Do you have feelings about that decision [between life and death] you want to express to the jury?" She replied: "I just feel he just, he never had a chance in growing up." Similarly, Angela Matthews, defendant's cousin, was asked: "Do you have feelings for your cousin that you want to express regarding the decision that the jury has to make?" She replied: "I love my cousin dearly. I don't want to see anything happen to him." It is not reasonably possible the jury would have reached a different result had it heard from Mary McGowan.

In addition to the question whether the evidence was properly found to be cumulative, defendant also argues the exclusion of McGowan's testimony violated his right to due process and reliability in the penalty determination under the Eighth and Fourteenth Amendments to the United States Constitution. A defendant in a capital case is entitled to have the jury consider any relevant mitigating evidence. (*Skipper v. South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669].) However, "[e]xclusion of such evidence . . . does not automatically require reversal, but is instead subject to the standard of review announced in *Chapman v. California, supra,* 386 U.S. 18, that is, the error is reversible unless it is harmless beyond a reasonable doubt." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1117–1118 [31 Cal.Rptr.2d 321, 875 P.2d 36]; see also *People v. Lucero* (1988) 44 Cal.3d 1006, 1031–1032 [245 Cal.Rptr. 185, 750 P.2d 1342].) In light of the many other

defense witnesses who testified in defendant's favor at the penalty phase, we find the exclusion of McGowan's testimony, if error, was harmless beyond a reasonable doubt.

### 15. *Exclusion of Defense Evidence That Medication Was Available to Control Defendant's Hyperactivity*

Defendant sought to elicit from defense witness, Dr. Nancy Kaser-Boyd, a clinical psychologist, whether defendant was a hyperactive child who could have been treated with the drug Ritalin. She testified she had "some concerns that [defendant] may have been hyperactive" based on her interview with defendant's mother, and upon learning defendant had a behavior problem in kindergarten. Dr. Kaser-Boyd related that defendant's school "thought he needed to be on Ritalin, which is an amphetamine that's often given to hyperactive children, and it has the biological effect of slowing them down and helping them to focus." When asked whether "hyperactive children commonly have problems in school, behavioral problems and social problems," she replied: "Yeah, they do. It depends to some extent on the severity of the hyperactivity, but even at the more mild ends they often come to the attention of the teacher." The prosecutor then objected, claiming the question called for speculation. When defense counsel asked the witness whether it is difficult to treat a hyperactive child, the prosecutor again objected, claiming the answer would be irrelevant. After a sidebar conference, the trial court sustained the objections, explaining the evidence would be irrelevant and that defense counsel had failed to lay an adequate foundation that Dr. Kaser-Boyd had sufficient medical expertise to answer the question.

Defendant contends the trial court's decision to exclude a portion of Dr. Kaser-Boyd's testimony violated his right to present relevant mitigating evidence under *Skipper v. South Carolina, supra,* 476 U.S. 1. Even under *Skipper,* "the United States Supreme Court has made clear that the trial court retains the authority to exclude, as irrelevant, evidence that has no bearing on the defendant's character, prior record or the circumstances of the offense." (*People v. Frye, supra,* 18 Cal.4th at p. 1015.) Although we review relevance determinations under a deferential standard of review (see, e.g., *People v. Weaver* (2001) 26 Cal.4th 876, 933 [111 Cal.Rptr.2d 2, 29 P.3d 103]), we find the trial court abused its discretion in restricting Dr. Kaser-Boyd's evidence. Defendant wished to present evidence that he may have been hyperactive as a child, that he may not have received sufficient medical or psychological treatment at an early age, that leaving his hyperactivity untreated led to his poor scholastic performance, and that this led him down a road to violence

and crime.[27] Such evidence was relevant to section 190.3, factor (k), which allows the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

The trial court seemed to labor under the misconception that, to be relevant, the witness's testimony would have to demonstrate a correlation between hyperactivity as a child and violent conduct later in life. Section 190.3, factor (k) evidence need not be that specific; it was sufficient that the sympathetic evidence of defendant's asserted untreated hyperactivity, which was relevant to his character, tended to extenuate the gravity of the crime. To find this evidence irrelevant would be to call into question much background and family history evidence commonly introduced in capital trials as mitigating evidence.

Although the trial court also excluded the evidence for lack of foundation, the record shows the witness had expertise and experience dealing with hyperactive children. It would be for the jury to decide whether defendant's asserted untreated hyperactivity was a sympathetic factor supporting imposition of a life sentence rather than a death sentence.

Although the trial court abused its discretion in excluding this evidence, the error was harmless beyond a reasonable doubt. (*People v. Fudge, supra,* 7 Cal.4th at pp. 1117–1118.) As noted, Dr. Kaser-Boyd was able to testify that she had concerns that defendant was hyperactive as a young child, and that his school thought he could benefit from taking Ritalin. Following the trial court's sustaining the prosecutor's objection, the witness testified—without objection—that, in her opinion, defendant's hyperactivity "very likely did" have an impact on his performance in school. Because defendant was able to put before the jury essentially the same evidence that had been excluded, we find any error in excluding evidence regarding defendant's hyperactivity as a child was harmless beyond a reasonable doubt.

### 16. *Alleged Use of Improper Rebuttal Evidence*

Following presentation of the defense case in mitigation, the prosecution proposed to call Sandra Thomas to testify that she was a friend of defendant and that, around the time of the crimes, he told her he would rob people of their cars and strip them for parts. Specifically, she would testify that

---

[27] Defense counsel argued the proposed evidence "is to show that he developed severe difficulties in school. And part of the doctor's concern is that had he—his condition of hyperactivity been dealt with properly he would have been more successful in school. [¶] That later impacted his life. He didn't perform well in school, he fell—dropped out at an early age, failed most of his courses, and she thinks—I mean, I think that has a direct effect on the pattern of his life."

defendant mentioned a Nissan truck (such as Christina Ramirez drove) and a Suzuki (such as Danny Coria drove). Defendant objected, claiming this evidence was not proper rebuttal evidence, but the trial court overruled the objection and allowed the evidence to be admitted. Defendant contends this ruling violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous provisions of the California Constitution. In particular, defendant complains the prosecution was allowed to introduce additional substantive evidence of his guilt, in the guise of rebuttal evidence, that was more properly part of its guilt phase case-in-chief. By contrast, he was denied fundamental fairness because he was barred from introducing evidence that might have fostered a lingering doubt as to his guilt. (*In re Gay* (1998) 19 Cal.4th 771, 813–814 [80 Cal.Rptr.2d 765, 968 P.2d 476] ["Evidence intended to create a reasonable doubt as to the defendant's guilt is not relevant to the circumstances of the offense or the defendant's character and record"].)

We explained the scope of rebuttal in *People v. Carter* (1957) 48 Cal.2d 737, 753–754 [312 P.2d 665]: "In a sense all evidence that tends to establish the defendant's guilt over his protestations of innocence rebuts the defendant's case, but it is not all rebuttal evidence within the purpose of section 1093, subdivision 4 [now section 1093, subdivision (d)]. The purpose of the restriction in that section is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence. Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt. [Citations.] A defendant's reiterated denial of guilt and the principal facts that purportedly establish it does not justify the prosecution's introduction of new evidence to establish that which defendant would clearly have denied from the start." (See also *People v. Daniels* (1991) 52 Cal.3d 815, 859 [277 Cal.Rptr. 122, 802 P.2d 906], quoting *Carter* with approval.)

Rebuttal evidence, however, " 'must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf.' " (*People v. Fierro* (1991) 1 Cal.4th 173, 238 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) "The admission of evidence in rebuttal is a matter left to the sound discretion of the trial court. [Citation.] The court's decision in this regard will not be disturbed on appeal in the absence of 'palpable abuse.' " (*People v. Hart* (1999) 20 Cal.4th 546, 653 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

Some of Thomas's testimony properly rebutted mitigating evidence defendant introduced. For example, Dr. Kaser-Boyd testified that defendant told her that he "got this job in construction and was hopeful that he could apprentice himself and learn construction that way." She said that defendant told her he had been working about one month prior to his arrest. This evidence tended to show defendant as a hardworking young man trying to improve himself by learning a trade. In rebuttal, Thomas testified that she was a close friend of defendant, close enough that defendant considered her a big sister. The following colloquy then occurred:

"Q. [by the prosecutor] During that time between 1987 and 1989, the day he got arrested or the time he got arrested, did you ever know him to work an honest job, anything like that?

"A. [by Sandra Thomas] No, sir.

"Q. Okay. Did he ever talk about working at all?

"A. No, sir.

"Q. Did he ever mention construction work that he was doing?

"A. Not at all.

"Q. Did you ever see him go to work or come back from work or anything like that?

"A. No."

Thomas then testified that defendant had told her he stole cars and stripped them for their parts, which he would sell to make money. In the course of this conversation, he mentioned he had stolen a Nissan or a Suzuki. Once when she was with him, a woman drove by in a Suzuki and he said "I'm going to get that bitch. He said, I'm jacking that. And that was his exact words." She said he seemed thrilled to be talking about it. Because Thomas's testimony responded to mitigating evidence suggesting defendant was a hardworking person, it was proper rebuttal and the trial court did not abuse its discretion in admitting it.

In addition, defendant points to testimony from Thomas that defendant disappeared for two weeks around the time Coria was shot and then reappeared looking scared and nervous, but holding $600 or $700. This evidence tended to show defendant was implicated in shooting Coria and stealing his Suzuki. We find this evidence was also properly admitted in

rebuttal. After the prosecution presented evidence from Willie Woods that defendant was the man who actually shot Coria, the defense called William Palmer to the stand. Palmer, a probation officer, had interviewed Woods to prepare a probation report. He said Woods told him a person named Torrey committed the crime (i.e., probably Torrey Bennett). Thomas's evidence thus tended to rebut Palmer's testimony. In short, we find the trial court did not err in admitting this evidence, and the admission of Thomas's testimony in rebuttal did not deny defendant fundamental fairness or any other constitutional rights.

### 17. *Failure to Hold a Hearing for Alleged Juror Misconduct*

Following the penalty verdict, the prosecutor and both defense counsel joined the 12 jurors and discussed the case. All 12 jurors expressed concern that defendant's gang would retaliate against them as a result of the verdict. One juror in particular thought he may have been followed by a gang member or a member of defendant's family. The jury foreperson, however, stated that concern over retaliation did not affect the jury's deliberations. The attorneys related their experience with the jury in declarations filed with the court. Based on these declarations, defendant moved for a new trial based on jury misconduct. The trial court denied the motion and made two points. First, the court noted that defense counsel did not request a hearing. Second, the court explained: "At this point, I do not believe there is enough here even for the Court to be concerned or feel an evidentiary hearing is anyway warranted or required. I have read [the declarations and] I am concerned; but I think, as I say, the declarations themselves belie any potential problem but the Court would be concerned about that. But, absent any declaration from jurors or other evidence based on what I have here, I find no reason to be concerned that if this [presumably, fear of retaliation from defendant's gang] was mentioned at some point that it played any part in the deliberations or was in any way prejudicial to the defendant as to the jury's decision."

Defendant contends the trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as analogous provisions of the California Constitution, by failing to hold a hearing to investigate potential jury misconduct. We disagree. "[W]hen a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415 [272 Cal.Rptr. 803, 795 P.2d 1260].) "[A hearing] should be held only when the defense has come forward

with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." (*Id.* at p. 419.)

Applying this rule here, we find the trial court did not abuse its discretion in declining to hold a hearing into potential jury misconduct. Although defense counsel's declaration indicated the jury was concerned about possible retaliation, it also states that a police detective active in the case assured the jury that defendant "was no longer active in the gangs in Compton, and in fact, was not welcome in Compton due to problems that developed between [defendant] and his gang." Moreover, when asked "whether anger or fear connected with the jurors' concerns of retaliation affected their deliberations," the jury foreperson replied in the negative. The prosecutor's declaration, which also stated that "defense counsel attempted to elicit contrary information but were clearly informed that any relationship he had with a gang played no part in reaching [the jury's] decision in the guilt or penalty phase," echoed this statement. Because defendant's evidence did not demonstrate "a strong possibility that prejudicial misconduct has occurred" (*People v. Hedgecock, supra,* 51 Cal.3d at p. 419), and no material fact was in dispute, the court's decision not to hold a hearing was well within its discretion.

## III. CONCLUSION

The guilt and penalty judgments are affirmed in their entirety.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied October 29, 2003, and the opinion was modified to read as printed above.